## T. J. COFFEY, JR., PETITIONER, ET AL.,[1] v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 9042, 19978–19989.   Promulgated June 30, 1950.

*E. Byron Singleton, Esq.*, and *Wilbur E. Swenson, C. P. A.*, for the petitioners.

*John W. Alexander, Esq.*, for the respondent.

[1] Proceedings of the following petitioners are consolidated herewith : Ruel Smith ; Gladys Smith (Mrs. Ruel Smith) ; Verna Smith Nichols ; Harold C. Rippy ; Lorene Rippy (Mrs. Harold C. Rippy) ; Thomas Jefferson Coffey (T. J. Coffey) ; Anne Coffey (Mrs. T. J. (Anne) Coffey) ; T. J. Coffey, Jr., and Catherine Coffey ; Bert Smith ; Tennie Smith (Mrs. Bert (Tennie) Smith) ; Myrtle Smith (Mrs. Myrtle Smith Ayers) ; and Robert William Smith (Minor).

1414

OPINION.

JOHNSON, *Judge*: The petitioners contend that they received the Cabot contingent payment of $200,000 as part of the consideration for stock sold and that any profit resulting from its receipt by them is taxable as a capital gain.  In the alternative they urge that, if the distribution of the Cabot payment constituted a dividend, it is taxable to the purchasers of the stock and not to them.  If we should hold that it was a dividend distribution taxable to them, they urge that its value was between $5,000 and $50,000.

The respondent contends that he correctly treated the distribution of the Cabot payment as a distribution by the corporation to petitioners of a dividend having a value of not less than $174,643.30.

Two witnesses for the respondent, one of whom was the vice president and treasurer of Hanlon-Buchanan, Inc., and the other the attorney for that corporation, both of whom were familiar with the negotiations leading up to the agreement of April 10, 1941, testified that the cash consideration the purchasers agreed to pay for the stock was based upon a computation of the net worth of the corporation; that in arriving at net worth the value of each asset and the amount of liabilities were taken into consideration; that the representatives of the purchasers and sellers could not agree upon the value of some of the assets; that the Cabot payment was one of these assets; that the representatives of the purchasers told petitioners' representatives that they had no interest in this asset because they considered it as having only prospective and at the time little if any value; and that they did not want it and petitioners could take it out of the company and they would buy the stock without it being a part of the sale.

We do not agree with petitioners that they received the Cabot payment as part of the consideration for the sale of their stock. The purchasers did not agree to buy their stock and then turn over to them $190,000 and the Cabot payment in consideration therefor. From the testimony above set forth it is apparent that they were not interested in the Cabot payment, did not want it included in the assets of the corporation at the time they acquired its stock, and negotiated with petitioners to acquire stock of a corporation whose assets did not include the unwanted Cabot payment. The offer of April 10, 1941, accepted by petitioners, was to pay $190,000 for the stock, subject, however, to the condition precedent that petitioners were to receive the Cabot payment from the corporation, and we think it quite significant that petitioners did not transfer their stock to the purchasers until a resolution was passed by the board of directors assuring petitioners of the receipt of the Cabot payment. This action, taken by the board of directors on May 15, 1941, distinguishes the facts of the instant proceedings from those in *Philip D. C. Ball*, 27 B. T. A. 388, 400 (aff'd., on another issue, 69 Fed. (2d) 439; certiorari denied, 292 U. S. 655), cited and relied upon by the petitioners, where no distribution of part of the assets of a corporation was authorized by its directors prior to the transfer by the seller of his stock to the purchaser. The fact that the stock was delivered to the purchasers on May 15, 1941, and that the president and secretary of the corporation did not execute the conveyances of interests in the Cabot payment to petitioners until May 17, 1941, does not establish that the Cabot payment came to petitioners from the purchasers. Under the provisions of the directors' resolution the right

to the Cabot payment accrued to petitioners on May 15, 1941, and they acquired this right as stockholders on March 28, 1941, and not in part payment for their stock. They received $190,000 for their stock. Under the contract of sale, they did not sell or part with their interest in the Cabot contract. It was expressly reserved by them and was a distribution they received as stockholders by virtue of the reservation.

The parties have stipulated that on February 28, 1941, the Smith Brothers Refinery Co., Inc., had earnings and profits of $191,547.60 in addition to the Cabot payment of $200,000 to which the corporation attributed no value at the time of its receipt and carried on its books at no cost. There is no evidence that this surplus decreased between February 28 and May 17, 1941, when distribution of the Cabot payment was made. On the latter date, therefore, the corporation had earnings and profits in excess of the amount of $174,643.30, which the respondent determined to be the value of the contingent payment on the date of its distribution. Inasmuch as it appears that the distribution was not in cancellation or redemption of all or a part of the corporation's stock, and therefore not a distribution in partial liquidation, it was a dividend distribution and taxable as such to the extent of its value.

The petitioners' contention that the Cabot payment had a value not in excess of $50,000 is based upon views and opinions expressed during the negotiations leading up to the sale. As heretofore noted, the representatives of the purchasers testified that they told the representatives of petitioners at that time that they were not interested in the Cabot payment because they considered it as having only prospective and little if any value. The attorney who represented the petitioners in these negotiations, when asked by respondent's counsel on cross examination what they thought with respect to the value of the Cabot payment at the time they were negotiating, testified:

I think we were about in concurrence on our opinion. I think we all thought it had a good potentiality of getting something, I don't think you could have found a one of us that would have said, "It will pay out a hundred percent." I think you would have found a lot of us that thought it might pay out fifty percent and then if you discounted that for present value, I believe the general feeling was that it was worth twenty-five cents on the dollar.

The negotiations leading up to the sale took place prior to April 10, 1941. At that time casinghead gas was selling at 2½ cents per gallon. Under the provisions of the contract of October 23, 1940, between Smith Brothers Refinery Co., Inc., and Cabot Carbon Co., nothing was to be paid unless the price of casinghead gas exceeded 2½ cents per gallon, and, in the event the price dropped lower than 2½ cents per gallon, a deficit would occur and such deficit would have to be made up before Smith Brothers Refinery Co., Inc., would be entitled to any payment. Between October 1940 and April 1941,

a deficit in the amount of $11,000 had accrued under the contract which had to be absorbed. It is not surprising, therefore, that during the negotiations the purchasers of petitioners' stock had a rather poor opinion as to the value of the Cabot payment and that the petitioners did not believe it was worth more than 25 cents on the dollar. After April 10, when the contract was entered into, the price of casinghead gas increased from 2½ cents per gallon to 3¾ cents on April 21, 1941, 3 cents on April 24, and 3⅛ cents on May 24. Obviously, therefore, the prospects of petitioners receiving substantial payments under the Cabot contract were enhanced between April 10 and May 17, and, as disclosed by our findings, the entire $200,000 due under this contract was paid to petitioners on or prior to March 31, 1944, and $98,370 of this amount was received by them during the year ended March 31, 1942.

In *Doric Apartment Co.* v. *Commissioner*, 94 Fed. (2d) 895, where it was urged that the subsequent history of certain second mortgage notes had no bearing whatsoever upon their value when received, the Court of Appeals for the Sixth Circuit made the following pertinent comment:

* * * Where * * * property has no ready or an exceedingly limited market, as is the case made here by the evidence, fair market value may be ascertained upon considerations bearing upon its intrinsic worth. *H. H. Miller Industries Co.* v. *Commissioner*, 6 Cir., 61 F. 2d 412, 414. There we held that in determining value the Board is not obliged at a later date to close its mind to subsequent facts and circumstances demonstrating it. It has also been held that where the search is for value all evidence is admissible bearing upon the matter. *Whitlow* v. *Commissioner*, 8 Cir., 82 F. 2d 569. As was said by the Supreme Court in *Sinclair Refining Co.* v. *Jenkins Petroleum Process Co.*, 289 U. S. 689, 697, 53 S. Ct. 736, 739, 77 L. Ed. 1449, 88 A. L. R. 496, upon a question of value, "but a different situation is presented if years have gone by before the evidence is offered. Experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within." See *Nachod & United States Signal Co.* v. *Helvering*, 6 Cir., 74 F. 2d 164; *American Chemical Paint Co.* v. *Commissioner of Internal Revenue*, 3 Cir., 66 F. 2d 381.

The burden was on the petitioners to establish that the value of the Cabot payment was less than the amount of $174,643.30 determined by the respondent to be its value on the date of its distribution to them. Petitioners have not sustained this burden. The pessimistic views which their representatives and representatives of the purchasers entertained prior to April 10, 1941, are not in our opinion indicative of the value of the Cabot payment on May 17, the date of its distribution. No opinion was expressed by the witnesses as to its value on the latter date when prospects for the receipt of the $200,000 were enhanced by the increase in the price of casinghead gas. We now know that the petitioners did receive the entire $200,000 prior to March 31, 1944, and

whatever uncertainty existed as to the value of the Cabot payment on the basic date has been removed. After a careful consideration of all of the evidence, we have reached the conclusion and found as a fact that the Cabot payment had a fair market value of $174,643.30 when distributed to the petitioners in May 1941. We are not impressed by petitioners' contention that this distribution was taxable to the purchasers rather than to them. As heretofore noted, the directors authorized the distribution to the stockholders as of March 28, 1941. The stockholders on that date and on the date of the authorization were the petitioners. Having received this dividend distribution, they are liable for tax to the extent of the interest therein received by each.

Before concluding, some reference should perhaps be made to the bases at the time of sale of stock held by petitioners Verna Smith Nichols, Myrtle Smith Ayers, and Robert William Smith. These three petitioners acquired this stock by inheritance as the result of the deaths in 1940 of Vester Smith and Porter Smith, president and vice president of the Smith Brothers Refinery Co., Inc., respectively, from the time of its incorporation. The parties have stipulated that the respondent placed a value of 41 cents per share on this stock for estate tax purposes at the time of settling the estate of Porter Smith and that in arriving at that valuation it was concluded that the corporation had assets over and above liabilities of $513,711.52. They also stipulated that in arriving at this latter figure, consideration was given to the fact that between the date of Porter Smith's death and the date of the sale of the stock to Hanlon-Buchanan, Inc., and J. H. Boyle, the corporation paid off liabilities of $140,371.52 and in selling the stock the stockholders received a cash consideration of $190,000, and also received the Cabot payment. While the respondent expressly did not stipulate that the Cabot payment so received was a part of the sales price, the petitioners apparently are of the opinion that he treated it as part of the sales price for estate tax purposes. Even if it be assumed that he did do this, and did not, as we think, merely use the value of the Cabot payment in arriving at the estimated value of the corporate assets, his action in the estate tax proceeding would not be binding on this Court in the instant proceedings in determining the nature of the distributions received by petitioners. For reasons hereinbefore set forth, the evidence in the instant proceedings convinces us that petitioners did not receive the Cabot payment as a part of the consideration for the sale of their stock and that it constituted a dividend distribution. As such, the pro rata portion received by each petitioner is taxable in its entirety as ordinary income, and is not affected by their respective bases for gain or loss.

*Decisions will be entered under Rule 50.*