Harold W. MILLER and Elizabeth A. Miller, Appellants,

v.

UNITED STATES of America, Seldon R. Glenn, Former Collector of Internal Revenue, and William M. Gray, Director of Internal Revenue, Appellees.

No. 12708.

United States Court of Appeals Sixth Circuit.

Aug. 3, 1956.

---

Albert F. Reutlinger, Louisville, Ky. (Louis Seelbach, Louisville, Ky., on the brief), for appellants.

Carolyn R. Just, Washington, D. C. (Charles K. Rice, Lee A. Jackson, A. F. Prescott, John J. Kelley, Jr., Washington, D. C., J. Leonard Walker, and Rhodes Bratcher, Louisville, Ky., on the brief), for appellees.

Before ALLEN and MARTIN, Circuit Judges, and STARR, District Judge.

MARTIN, Circuit Judge.

The United States District Court denied recovery in an action brought by appellants for refund, with interest, of income taxes and excess profits taxes paid by Harold W. Miller as sole transferee and stockholder of Melrose Manor Corporation, for 1946 and 1947, and by Miller and his wife, jointly, for refund with interest of income taxes paid by them for the years 1948, 1949 and 1950.

The district court upheld the determination of the Commissioner of Internal Revenue that the second-mortgage notes held by Melrose Manor Corporation at the end of the fiscal year 1946, in the aggregate amount of $55,912, had a fair market value at that time of twenty-five percent of the face value of the notes; and that, therefore, a deficiency in tax in the amount of $13,978 had properly been assessed.

Likewise, the district court upheld a determination by the commissioner of a deficiency in the income tax of Miller amounting to $4,633.26 for 1947, based upon the proposition that the second-mortgage notes had a fair market value of twenty-five percent of their face value during that year.

Appellant Harold W. Miller, as sole transferee of the assets of the Melrose Manor Corporation, is admittedly liable for any tax deficiencies due by the corporation for the year 1946. The contention of the taxpayers on this appeal is that the finding of the district court—that the second-mortgage notes had a "fair market value" during the corporation fiscal year ending May 31, 1946, and upon the corporation's dissolution some ten months later—is unsupported by substantial evidence and is clearly erroneous.

Briefly stated, the salient facts are that Harold W. Miller, a prominent real estate man and builder in Louisville, organized a Kentucky corporation in 1942 for the purpose of building houses for defense plant workers. Most of these houses were sold in 1946 and 1947 under a twenty-five-year Federal Housing Administration first-mortgage plan. Dur-

ing 1946, forty houses were sold for an aggregate sum of more than $285,000, in consequence of which second-mortgage notes for nearly $56,000 were acquired by the corporation. When the corporation was dissolved in the spring of 1947, its entire assets, including $66,734.56 of second-mortgage notes, were transferred to Miller as its sole stockholder.

The corporation reported no income from the second-mortgage notes received by it in the fiscal year 1946 and during 1947 to the time of its dissolution; but, in each tax returned filed by it, a notation was made in relation to the second-mortgage notes: "Deferred income collections credited to income as received." In his 1947 tax return and his returns for all subsequent years, Harold W. Miller returned, computed and paid taxes on the basis that the second-mortgage notes had no fair market value when received by him in 1947. He paid income taxes on the second-mortgage notes during the respective fiscal years in which he collected on them. Mortgages securing the second-mortgage notes were all inferior to first mortgages based on ninety percent of the appraised value of the property by which they were secured. The amortization of the first mortgages extended over a twenty-five-year period.

Among the fact findings of the district court was the following: "In the fall of 1946, Harold W. Miller testified, that desiring to consolidate his financial position, he caused both Melrose Manor Corporation and the Will B. Miller Company, both of which corporations he controlled, to offer for sale all of the second mortgage notes held by both corporations. This offering was made to banks, investment houses, mortgage companies, and real estate brokers. Without exception, the replies he received were that none of them was interested in purchasing the notes and they believed no market could be found for them. Miller, who had been in the real estate business for over thirty years and three disinterested witnesses, who likewise were experienced real estate dealers, testified that none of the second mortgage notes held by the Mel-rose Manor Corporation during the period June 1, 1945 to May 31, 1946, and March 26, 1947, had any fair market value.

"No witnesses or other proof were offered by defendants to show the basis for its contention that the notes had a market value of twenty-five percent or any value."

The applicable Revenue Act provides that the amount realized from the sale of property shall be the sum of money received, plus the fair market value of property (other than money) received. In upholding the determination of the commissioner that the second-mortgage notes had a fair market value of twenty-five percent at the time of their distribution to Miller, the district judge observed that subsequent payment of substantially $50,000 through the year 1950 would indicate that the commissioner was correct, "though it must be readily conceded that the evidence in the case, aside from the agreement as to payments subsequent to 1946, is to the effect that there was no market value on the second mortgages in 1943 and 1944."

The judge expressed the view that the decisions in Cambria Development Co. v. Commissioner, 34 B.T.A. 1155, and Ravlin Corporation, 19 B.T.A. 1112, relied upon by the taxpayers, had been superseded by the tax court's decision in T. J. Coffey, Jr., 14 T.C. 1410, wherein the opinion of this court in Doric Apartment Co. v. Commissioner, 6 Cir., 94 F.2d 895, had been cited as authority. The district judge quoted from the opinion in the Doric case (as hereinafter set forth) and also quoted expressions from the opinions in Sinclair Refining Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 53 S.Ct. 736, 77 L.Ed. 1449, and H. H. Miller Industries Co. v. Commissioner, 6 Cir., 61 F.2d 412, 414.

The opinion of the district court was thus concluded [130 F.Supp. 918]: "When the Commissioner made the assessment here involved in 1952, he had the advantage of the experience of the second mortgage notes and knew that substantially $50,000 had been paid.

With this information, it could not be said that his estimate of value of twenty-five percent of the face amount of the securities was not a fair appraisal. Certainly, it could not be held to be clearly erroneous, because in 1947, the witnesses who testified in this case thought that the securities had no fixed or fair market value.

"It is therefore concluded that the Commissioner's assessment should stand and the petition herein should be dismissed."

In the light of established facts in this case, we are not in accord with the district court's conclusion. We think that his ultimate finding of fact was clearly erroneous. If negotiable securities such as mortgage notes are shown by uncontroverted evidence to have had no fair market value at the time they were received in trade, they should not be assumed retrospectively to have had an actual market value contrary to the realities of the case merely because the notes were subsequently—in large part—collected when due.

The taxpayer in the present controversy made no attempt whatever to escape or avoid legitimate taxation. He paid income taxes upon the full amount realized from the second-mortgage notes as and when he collected payment of them. Experience has demonstrated that second-mortgage notes, when subordinated to first mortgages to the extent of ninety percent of the value of the property, are highly speculative securities. It is easily understandable, therefore, that there could be no fair market value for such second-mortgage securities when received. If foresight were on a par with hindsight, there would be few losers in the speculative market place. Holders of second mortgages during the period from 1929 to 1932 could hardly be convinced that their second-mortgage real estate notes then had any fair market value. We think the action of the commissioner who placed a twenty-five percent valuation upon the second-mortgage notes in controversy was arbitrary, clearly erroneous, and contrary to practical considerations, which should be applied in determining the fair market value of negotiable securities.

The position of the taxpayers in the instant case is supported by several opinions of the expert national tax tribunal. See Cambria Development Co. v. Commissioner, 34 B.T.A. 1155; Ravlin Corporation, 19 B.T.A. 1112; Somers Lumber Co., 2 B.T.A. 106; and Joliet-Norfolk Farm. Corporation v. Commissioner .of Internal Revenue, 8 B.T.A. 824. In the Cambria case, it was held that negotiable paper which represented approximately sixty percent of the sale price of real estate had no fair market value for tax purposes, regardless of the fact that subsequently substantial collections were made on the paper. This was considered insufficient to support an inference of fair market value at the earlier date involved in contravention of the direct testimony of unimpeached witnesses.

Likewise, in the Ravlin case, it was held that the evidence that deferred payments had a fair market value was unsatisfactory, where it was shown that there was no market for the paper and that the notes were unacceptable as collateral when received. In the Somers case, the opinion of the owner of the property involved and that of an expert real estate man familiar with values in the immediate vicinity were accepted in the absence of contradictory evidence. In the Joliet-Norfolk case, it was held that the second-mortgage notes had no fair market value at the time they were received.

We are not in accord with the conclusion of the district judge that the authority of these cases has been weakened by the decision in T. J. Coffey, Jr. v. Commissioner, 14 T.C. 1410, or by that in Doric Apartment Co. v. Commissioner of Internal Revenue, 6 Cir., 94 F.2d 895. In the Coffey case, the controversy concerned the value of a contract relating to the payment for casinghead gas. There was positive evidence that, before the controlling date for valuation, the price of such gas exceeded two-and-one-half cents per gallon, the contingency which required the payment of royalties.

The feature distinguishing that case from this is that, there, the tax court took into account positive evidence of value prior to the controlling date, in addition to evidence of subsequent payments. Here, the assessment of the Commissioner of Internal Revenue was based entirely upon evidence of subsequent payments.

Doric Apartment Co. v. Commissioner, supra, is also distinguishable. The district judge quoted the following language from the Doric case: " 'Where, however, property has no ready or an exceedingly limited market, as is the case made here by the evidence, fair market value may be ascertained upon considerations bearing upon its intrinsic worth. H. H. Miller Industries Co. v. Commissioner, 6 Cir., 61 F.2d 412, 414. There we held that in determining value the Board is not obliged at a later date to close its mind to subsequent facts and circumstances demonstrating it.' " The applicability of this language must be considered in the context.

In the Doric case, there was expert testimony that the second-mortgage notes had a value when received, ranging from two-thirds to eighty percent of face value; in the present controversy, no such testimony was received and, in fact, the only expert testimony is to the effect that the second-mortgage notes had no fair market value when received. In the Doric case, the second mortgage represented a substantial equity in the property involved; in the case at bar, the security behind the second-mortgage notes represented only ten percent of the appraised value of the property. In the Doric case, the individual debtor was a man of integrity considered to possess substantial assets; in the instant case, the makers of the second-mortgage notes were not shown to be persons of substantial means. Indeed, some of them possessed insufficient cash to pay the difference between the Federal Housing Administration loan and the purchase price. In the Doric case, some of the second-mortgage paper was sold for eighty percent of face value shortly after the cru-

cial year, while none of the second-mortgage notes in the case at bar has been sold at any price so far as the record discloses. In the Doric case, there was substantial evidence that during the year involved the second mortgage had value; here, there was no such evidence, but merely a showing that there were subsequent collections made on the second-mortgage notes.

In considering the impracticality of a retrospective viewpoint, the expressions of Mr. Justice Holmes in City of New York v. Sage, 239 U.S. 57, 61, 36 S.Ct. 25, 60 L.Ed. 143, and in Ithaca Trust Co. v. United States, 279 U.S. 151, 155, 49 S.Ct. 291, 73 L.Ed. 647, and likewise the saying of the Supreme Court in United States v. American Bell Telephone Co., 167 U.S. 224, 261, 17 S.Ct. 809, 42 L.Ed. 144, may be elucidating.

The opinion of this court in H. H. Miller Industries Co. v. Commissioner of Internal Revenue, 6 Cir., 61 F.2d 412, dealt with the valuation of a patent, which, from its inherently unique character, was far afield from a determination of fair market value of negotiable instruments, when received. The H. H. Miller Industries case bears no true analogy to that at bar.

Moreover, the opinion of this court in Mott v. Commissioner of Internal Revenue, 6 Cir., 139 F.2d 317, does not contravene our holding here. In the Mott case, we held that the tax court was not required to accept the opinions of expert witnesses introduced by the taxpayer as to the value of listed corporate stock for gift tax purposes, *where there was substantial evidence contrary to such testimony*. Judge Allen said: "It does not appear that the block of 100,000 shares [General Motors Corporation common stock] could not have been sold on the market at its quoted prices within a reasonable time by skilled brokers following prudent liquidation practices. In fact the record shows the contrary. * * * The history of the actual sales and the prices secured demonstrate that a reasonably efficient liquidation of the stock within a short time after December

5, 1939 [the date for determining the fair market value of the stock], would have sustained the values assessed by the Commissioner." In the instant case, it was proved by positive evidence that there was no fair market value for the second-mortgage notes in controversy at the time the notes were received by the taxpayer.

Nor is our opinion in First National Bank of Memphis v. Commissioner of Internal Revenue, 6 Cir., 125 F.2d 157, contrary to our present pronouncements. In that case, we pointed out that in its evaluation of real estate and leasehold interests the Board of Tax Appeals had before it sufficient data to support its findings. It was observed that such data included the length of the leases, the rentals therein provided, the percentages of occupancy and the financial responsibility of the tenants. We held, therefore, that the findings of the board were not clearly erroneous and that its decision should be upheld.

In Gamble v. Commissioner, 6 Cir., 101 F.2d 565, it was held that, *in view of substantial evidence to the contrary,* including testimony of the commissioner's expert, the Board of Tax Appeals was not bound to accept the opinion of the petitioning taxpayers' experts as to values.

In his opinion, the district judge quoted the following language from Sinclair Refining Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 698, 53 S.Ct. 736, 739, 77 L.Ed. 1449: " 'But a different situation is presented if years have gone by before the evidence is offered. Experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within.' " But this language was used in relation to the appraisal of the value of a patent at the time of a breach of contract concerning it. The Supreme Court said: "This is not a case where the recovery can be measured by the current prices of a market. A patent is a thing unique. There can be no contemporaneous sale to express the market value of an invention

that derives from its novelty its patentable quality. [Citing cases.] But the absence of market value does not mean that the offender shall go quit of liability altogether. The law will make the best appraisal that it can, summoning to its service whatever aids it can command." 289 U.S. 697, 53 S.Ct. 739.

Here, we are not dealing with a unique thing, such as a patent, but are concerned with the evaluation of ordinary commercial paper in the form of second-mortgage notes. There was no evidence in the instant case to rebut the positive proof that the second-mortgage notes in controversy, when received by the taxpayer, had no fair market value.

The judgment of the district court is reversed; and the cause is remanded with directions that the refund claims of appellants be allowed in conformity with the principles declared in this opinion.