**TSN LIQUIDATING CORPORATION, INC., Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 78–3192.

United States Court of Appeals, Fifth Circuit.

Aug. 28, 1980.

---

Cecil E. Munn, Harry E. Bartel, Fort Worth, Tex., for plaintiff-appellant.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Act. Chief, App. Section, Gary R. Allen, Thomas M. Preston, Tax Div., U. S. Dept. of Justice, Washington, D. C., for defendant-appellee.

Before FAY, KRAVITCH and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

This case presents the question whether assets distributed to a corporation by its subsidiary, immediately prior to the sale by such corporation of all the capital stock of such subsidiary, should be treated, for federal income tax purposes, as a dividend or, as the district court held, as part of the consideration received from the sale of such capital stock. We hold that on the facts of this case, the assets so distributed constituted a dividend and we reverse the judgment of the district court.

In 1969, TSN Liquidating Corporation, Inc. ("TSN"), which was then named "Texas State Network, Inc.," owned over 90% of the capital stock of Community Life Insurance Company ("CLIC"), an insurance company chartered under the laws of the State of Maine. In early 1969, negotiations began for the purchase of CLIC by Union Mutual Life Insurance Company ("Union Mutual"). On May 5, 1969, TSN and the other CLIC stockholders entered into an Agreement of Stock Purchase (the "Stock Purchase Agreement") with Union Mutual for the sale of the capital stock of CLIC to Union Mutual. The Stock Purchase Agreement provided that there would be no material adverse change in the business or assets of CLIC prior to the closing "except that as of closing certain shares and capital notes as provided in Section '4.(i).' above will not be a part of the assets of [CLIC]." Since the purchase price of the capital stock of CLIC under the Stock Purchase Agreement was based primarily on the book value (or, in some instances, market value) of those assets owned by CLIC on the closing date, the purchase price would be automatically reduced by the elimination of such shares and notes from the assets of CLIC. On May 14, 1969, as contemplated by the Stock Purchase Agreement, the Board of Directors of CLIC declared a dividend in kind, payable to stockholders of record as of May 19, 1969, consisting primarily of capital stock in small, public companies traded infrequently and in small quantities in the over-the-counter market. On May 20, 1969, the closing was held and Union Mutual purchased substantially all the outstanding capital stock of CLIC, including the shares held by TSN. The final purchase price paid by Union Mutual to the selling stockholders of CLIC was $823,822, of which TSN's share was $747,436. Union Mutual thereupon contributed to the capital of CLIC $1,120,-000 in municipal bonds and purchased from CLIC additional capital stock of CLIC for $824,598 in cash paid to CLIC.

In its income tax return for the fiscal year ended July 31, 1969, TSN reported its receipt of assets from CLIC as a dividend and claimed the 85% dividends received deduction available to corporate stockholders pursuant to § 243(a)(1) of the Internal Revenue Code of 1954. TSN also reported its gain on the sale of the capital stock of CLIC

on the installment method pursuant to § 453 of the Code. On audit, the Internal Revenue Service treated the distribution of the assets from CLIC to TSN as having been an integral part of the sale by TSN of capital stock of CLIC to Union Mutual, added its estimate ($1,677,082) of the fair market value of the assets received by TSN to the cash ($747,436) received by TSN on the sale, and disallowed the use by TSN of the installment method for reporting the gain on the sale of the capital stock of CLIC since aggregating the fair market value of the distributed assets and the cash resulted in more than 30% of the proceeds from the sale being received in the year of sale. TSN paid the additional tax due as a result of such treatment by the Internal Revenue Service, filed a claim for a refund and subsequently instituted this action against the Internal Revenue Service.

The district court made the following findings of fact in part II of its opinion:

With regard to the negotiations between CLIC and Union Mutual in early 1969, the Court finds that Union Mutual was interested in purchasing CLIC and proposed a formula for valuing the assets, liabilities, and insurance in force, which, together with an additional amount, would be the price paid for the CLIC stock.

The investment portfolio of CLIC was heavily oriented toward equity investments in closely held over-the-counter securities. At least in the mind of CLIC's officers, the makeup of CLIC's investment portfolio was affecting its ability to obtain licenses in various states. As early as the Spring of 1968, the management and principal stockholders of CLIC had begun to seek a solution to the investment portfolio problem. The Court finds, however, that CLIC had never formulated a definite plan on how to solve its investment portfolio problem.

Union Mutual did not like CLIC's investment portfolio but considered bonds to be more in keeping with insurance industry responsibilities. The management of CLIC regarded the Union Mutual offer as a good one, and tried without success to get Union Mutual to take the entire investment portfolio.

Accordingly, the [Stock Purchase Agreement] required CLIC to dispose some of the investment portfolio assets. Thus, the price that would be paid for the CLIC stock was based upon a formula which valued the assets after excluding certain stocks.

. . . . .

Plaintiff's disposition of the undesirable over-the-counter stock was necessitated by its sale arrangements with Union Mutual. Plaintiff had no definite plans prior to its negotiations with Union Mutual as to how to get rid of the undesirable stock, when it was to get rid of the undesirable stock, or even that it would definitely get rid of the undesirable stock. Accordingly, the Court finds that the dividend in kind of 14 May 1969 was part and parcel of the purchase agreement with Union Mutual.

*TSN Liquidating Corp. v. United States*, 77–2 U.S.Tax Cas. ¶ 9741 at 88,523 (N.D. Tex.1977). In part III of its opinion, the district court made the following additional findings:

Union Mutual was interested in purchasing the stock of an approximately $2 million corporation in order that that corporation might be licensed to do business in other states. Tr. 92. As of 30 April 1969, CLIC had assets of $2,115,138. DX 2. On 14 May 1969, CLIC declared a dividend valued at approximately $1.8 million. As a result of this dividend, CLIC was left with assets totaling approximately $300,000. The final purchase price paid by Union Mutual to the selling shareholders of CLIC was $823,822. In addition, Union Mutual contributed $1,120,000 of municipal bonds to the capital of CLIC and purchased additional shares of stock of CLIC for $824,598. DX 3. Thus, subsequent to closing on 20 May 1969, CLIC was worth $2,400,000. DX 3. Thus, CLIC was worth $2 million when the [Stock Purchase Agreement] was signed on 5 May 1969 and worth over $2 million immediately after closing.

There was no business purpose served in this case by the dividend declared by CLIC prior to the sale of all its stock to Union Mutual. It is evident that the dividend benefitted the shareholders of CLIC and not CLIC itself. There was no benefit or business purpose in CLIC's declaration of the dividend separate and apart from the sale. The Court finds that the dividend would not, and could not, have been made without the sale.

. . .

What actually happened in the period 5 through 20 May 1969 was that the stockholders received $1.8 million in virtually tax-free stocks, as well as over $800,000 in cash, for a total of approximately $2.6 million. This was certainly a fair price for a corporation valued at the time of sale at $2,115,138, and reflects a premium paid for good will and policies in force, as well as the fact that CLIC was an existing business with licenses in eight or nine states. Hence, a $2 million corporation was sold for $2.6 million including the dividend and the cash.

*Id.* at 88,525.

After noting the time-honored principle that the incidence of taxation is to be determined by the substance of the transaction rather than by its form and the related principle that the transaction is generally to be viewed as a whole and not to be separated into its component parts, the district court held:

The distribution of assets to [TSN] from its subsidiary, CLIC, immediately prior to [TSN's] disposition of its entire stock interest in CLIC should be treated as a part of the gain from the sale of the stock. Thus, the Court concludes that the in-kind distribution of 14 May 1969 to the stockholders of CLIC is taxable to [TSN] as gain from the sale of its stock. The alleged dividend was merely intented [sic] to be part of the purchase price paid by Union Mutual to CLIC for its stock.

*Id.* at 88,527. The district court relied for its holding primarily on the cases of *Waterman Steamship Corp. v. Commissioner*, 430 F.2d 1185 (5th Cir. 1970), *cert. de-*

*nied*, 401 U.S. 939, 91 S.Ct. 936, 28 L.Ed.2d 219 (1971), and *Basic, Inc. v. United States*, 549 F.2d 740 (Ct.Cl.1977), all discussed *infra*.

On appeal, TSN argues that the cases relied upon by the district court are exceptions to what TSN characterizes as the established rule, namely, that assets removed from a corporation by a dividend made in contemplation of a sale of the stock of that corporation, when those assets are in good faith to be retained by the selling stockholders and not thereafter transferred to the buyer, are taxable as a dividend and not as a part of the price paid for the stock for the reason that, in economic reality and in substance, the selling stockholders did not sell and the buyer did not purchase or pay for the excluded assets. The principal cases cited by TSN for its position are *Gilmore v. Commissioner*, 25 T.C. 1321 (1956), *Coffey v. Commissioner*, 14 T.C. 1410 (1950), and *Rosenbloom Finance Corp. v. Commissioner*, 24 B.T.A. 763 (1931). According to TSN, the controlling distinction between the *Coffey* line of cases relied upon by TSN and the *Waterman* line of cases relied upon by the district court is whether the buyer negotiated to acquire and pay for the stock, exclusive of the assets distributed out as a dividend, on the one hand, or whether the buyer negotiated to acquire and pay for the stock, including the assets which were then the subject of a sham distribution designed to evade taxes, on the other hand. In the former case, according to TSN, there is a taxable dividend; in the latter case there is not.

■ We begin by noting that the district court was certainly correct in its position that the substance of the transaction controls over the form and that the transaction should be viewed as a whole, rather than being separated into its parts. Further, having reviewed the record, we are of the view that the operative facts found so carefully by the district court are entirely accurate (except for the valuation of the distributed assets, as to which we express no opinion). We differ with the district court only in the legal characterization of those facts and in the conclusion to be drawn

therefrom. We agree with TSN that this case is controlled by the *Coffey, Gilmore* and *Rosenbloom* cases rather than by the *Waterman* and *Basic* cases relied upon by the district court.

In *Coffey*, the principal case relied upon by TSN, the taxpayers owned the stock of Smith Brothers Refinery Co., Inc. and were negotiating for the sale of such stock. Representatives of the purchasers and representatives of the sellers examined and discussed the various assets owned by Smith Brothers Refinery Co., Inc., and the liabilities of the company, with a view to reaching an agreement upon the fair market value of the stock. During these negotiations, the representatives of the purchasers and of the sellers could not agree upon the value of certain assets (including a contingent receivable referred to as the Cabot payment). The representatives of the purchasers informed the representatives of the sellers that the sellers could withdraw those assets from the assets of the company and that they would buy the stock without those assets being a part of the sale, thereby eliminating the necessity for arriving at a valuation of those assets in determining the value of the stock on a net worth basis. The contract of sale provided that the unwanted assets would be distributed by the corporation as a dividend prior to the sale of the stock. The selling stockholders contended before the tax court, as the Internal Revenue Service does in the case before this court, that the Cabot payment distributed to them as a dividend in kind was "part of the consideration for stock sold and that any profit resulting from its receipt by them is taxable as a capital gain." The tax court rejected that contention because it was contrary to the substance of the transaction:

> We do not agree with petitioners that they received the Cabot payment as part of the consideration for the sale of their stock. The purchasers did not agree to buy their stock and then turn over to them $190,000 and the Cabot payment in consideration therefor. From the testimony above set forth it is apparent that they were not interested in the Cabot payment, did not want it included in the assets of the corporation at the time they acquired its stock, and negotiated with petitioners to acquire stock of a corporation whose assets did not include the unwanted Cabot payment. . . . They received $190,000 for their stock. Under the contract of sale, they did not sell or part with their interest in the Cabot contract. It was expressly reserved by them and was a distribution they received as stockholders by virtue of the reservation.

*Coffey*, 14 T.C. at 1417, 1418. The tax court held the distribution to be a dividend.

In *Gilmore*, the purchasers of corporate stock did not wish to pay for quick assets owned by the corporation, namely cash on hand and United States bonds, and the parties provided for a presale dividend to exclude them from the assets to be transferred to the purchaser by means of the sale of the corporate stock. The tax court held that the assets distributed to the stockholders by means of a dividend were taxable as a dividend and not as a part of the sales proceeds for the corporate stock:

> It may be true the parties could have reached much the same result and have avoided some tax consequences to the stockholders by casting the transaction in the form of a higher purchase offer that would have included all of the quick assets. But this just was not done. . . . The [purchasers] chose to make this offer, one that "waived" the quick assets after payment of indebtedness. . . . The [purchasers] did not agree to pay the stockholders $6.50 or any other sum from the surplus. They "waived any claim" to the surplus and consented that it "may be paid to the present stockholders." . . .

In *T.J. Coffey, Jr.*, 14 T.C. 1410, a situation similar to the one here was before the Court and we held that the corporate distributions there involved were not a part of the consideration for the sale of stock.

*Gilmore*, 25 T.C. at 1323, 1324.

In *Rosenbloom*, the sole stockholder of Joseph S. Finch Company was Rosenbloom

Finance Corporation. Rosenbloom entered into a contract for the sale of all the capital stock of Joseph S. Finch Company to Shenley Products Company. With respect to the unwanted assets, the contract provided:

"All other assets of every character whatsoever owned by the Finch Company at the time of the transfer of said shares of stock, as herein provided, shall be transferred to the party of the first part (petitioner) by dividend distribution, prior to the consummation of the sale of said shares of stock herein provided for."

*Rosenbloom*, 24 B.T.A. at 769. The board of tax appeals held that the assets distributed to Rosenbloom Finance Corporation by Joseph S. Finch Company should be treated as an ordinary dividend and not as an amount distributed in partial liquidation. *See also West v. Commissioner*, 37 T.C. 684 (1962); *Wilson v. Commissioner*, 27 T.C. 976 (1957), *aff'd*, 255 F.2d 702 (5th Cir. 1958); and *T. C. Power & Brother v. Commissioner*, 6 B.T.A. 835 (1927), *appeal dismissed*, 27 F.2d 116 (9th Cir. 1928).

The Internal Revenue Service states that it does not disagree with the holdings in *Coffey, Gilmore* and *Rosenbloom*, but it takes the position that they do not apply in the circumstances of this case. The Internal Revenue Service focuses on the receipt by the selling stockholders of CLIC of investment assets, followed immediately by an infusion by Union Mutual of a like amount of investment assets into CLIC, and says that the reinfusion of assets brings the case before the court within the "conduit rationale" of *Waterman*. In *Waterman*, Waterman Steamship Corporation ("Waterman") was the owner of all the outstanding capital stock of Pan-Atlantic Steamship Corporation ("Pan-Atlantic") and Gulf Florida Terminal Company, Incorporated ("Gulf Florida"). Malcolm P. McLean made an offer to Waterman to purchase all the outstanding capital stock of Pan-Atlantic and Gulf Florida for $3,500,-000. Since Waterman's tax basis for the stock of the subsidiaries totaled $700,000, a sale of the capital stock of the subsidiaries for $3,500,000 would have produced a taxable gain of approximately $2,800,000. Be-

cause the treasury regulations on consolidated returns provided that the dividends received from an affiliated corporation are exempt from tax, a sale of capital stock of the subsidiaries for $700,000, after a dividend payment to Waterman by the subsidiaries of $2,800,000, would, at least in theory, have produced no taxable gain. The Board of Directors of Waterman rejected McLean's offer, but authorized Waterman's president to submit a counter proposal providing for the sale of all the capital stock in the subsidiaries for $700,000, but only after the subsidiaries paid dividends to Waterman in the aggregate amount of $2,800,000. As finally consummated, the dividends and the sale of the capital stock of the subsidiaries took the following form:

(1) Pan-Atlantic gave a promissory note to Waterman for $2,800,000 payable in 30 days as a "dividend."

(2) One hour later, Waterman agreed to sell all of the capital stock of Pan-Atlantic and Gulf Florida for $700,000.

(3) Thirty minutes later, after the closing of the sale of the capital stock of the subsidiaries had occurred, Pan-Atlantic held a special meeting of its new Board of Directors, and the Board authorized Pan-Atlantic to borrow $2,800,000 from McLean and a corporation controlled by McLean. Those funds were used by Pan-Atlantic promptly to pay off the $2,800,-000 note to Waterman (which was not yet due).

In its tax return for the fiscal year involved, Waterman eliminated from income the $2,800,000 received as a dividend from Pan-Atlantic and reported $700,000 as the sales price of the capital stock of the two subsidiaries. Since Waterman's tax basis for the stock was the same as the sales price therefor, no taxable gain was realized on the sale. On audit, the Internal Revenue Service took the position that Waterman had realized a long-term capital gain of $2,800,000 on the sale of the capital stock of the subsidiaries and increased its taxable income accordingly. On appeal from a judgment by the tax court in favor of the taxpayer, the Internal Revenue Service con-

tended that the rules applicable to situations where a regular dividend has been declared are not applicable when the parties contemplate that a purported dividend is to be inextricably tied to the purchase price and where, as was the case before the court, the amount of the dividend is not a true distribution of corporate profits. The Internal Revenue Service argued that the funds were supplied by the buyer of the stock, with the corporation acting as a mere conduit for passing the payment through to the seller. This court agreed with the Internal Revenue Service:

> The so-called dividend and sale were one transaction. The note was but one transitory step in a total, pre-arranged plan to sell the stock. We hold that in substance Pan-Atlantic neither declared nor paid a dividend to Waterman, but rather acted as a mere conduit for the payment of the purchase price to Waterman.

*Waterman*, 430 F.2d at 1192. The opinion of this court began with this sentence:

> This case involves another attempt by a taxpayer to ward off tax blows with paper armor.

*Id.* at 1185. The opinion stressed the sham, tax motivated aspects of the transaction:

> Here, McLean originally offered Waterman $3,500,000 for the stock of Pan-Atlantic and Gulf Florida. Waterman recognized that since its basis for tax purposes in the stock was $700,180, a taxable gain of approximately $2,800,000 would result from the sale. It declined the original offer and proposed to cast the sale of the stock in a two step transaction. Waterman proposed to McLean that it would sell the stock of the two subsidiaries for $700,180 after it had extracted $2,800,000 of the subsidiaries' earnings and profits. It is undisputed that Waterman intended to sell the two subsidiaries for the original offering price—with $2,800,000 of the amount disguised as a dividend which would be eliminated from income under Section 1502. Waterman also intended that none of the assets owned by the subsidiaries would be removed prior to the sale. Although the

distribution was cast in the form of a dividend, the distribution was to be financed by McLean with payment being made to Waterman through Pan-Atlantic. To inject substance into the form of the transaction, Pan-Atlantic issued its note to Waterman before the closing agreement was signed. The creation of a valid indebtedness however, cannot change the true nature of the transaction. . . .

> . . . .

> The form of the transaction used by the parties is relatively unimportant, for the true substance and effect of their agreement was that McLean would pay $3,500,000 for all of the assets, rights and liabilities represented by the stock of Pan-Atlantic and Gulf Florida.

*Id.* at 1194–95. This court concluded its opinion in *Waterman* by cautioning against "giving force to 'a purported [dividend] which gives off an unmistakeably hollow sound when it is tapped.'" *Id.* at 1196 (quoting *United States v. General Geophysical Co.*, 296 F.2d 86, 89 (5th Cir. 1961), *cert. denied*, 369 U.S. 849, 82 S.Ct. 1156, 8 L.Ed.2d 8 (1962)). A final footnote to the opinion stated that the decision should not be interpreted as standing for the proposition that a corporation which is contemplating a sale of its subsidiary's stock could not under any circumstances distribute its subsidiaries' profits prior to the sale without having such distribution deemed part of the purchase price. *Id.* at 1196 n. 21.

■ In summary, in *Waterman*, the substance of the transaction, and the way in which it was originally negotiated, was that the purchaser would pay $3,500,000 of its money to the seller in exchange for all the stock of the two subsidiaries and none of the assets of those subsidiaries was to be removed and retained by the sellers. In the case before the court, the district court found that Union Mutual did not want and would not pay for the assets of CLIC which were distributed to TSN and the other stockholders of CLIC. Those assets were retained by the selling stockholders. The fact that bonds and cash were reinfused into CLIC after the closing, in lieu of the

unwanted capital stock of small, publicly held corporations, does not convert this case from a *Coffey* situation, in which admittedly unwanted assets were distributed by the corporation to its stockholders and retained by them, into a *Waterman* situation, in which the distribution of assets was clearly a sham, designed solely to achieve a tax free distribution of assets ultimately funded by the purchaser. Indeed, the Internal Revenue Service does not argue, in the case before the court, that the transaction was in any respect a sham. Instead, the Service would have us hold that the mere infusion of assets into the acquired company after the closing, assets which are markedly different in kind from the assets that were distributed prior to the closing, should result in the disallowance of dividend treatment for the distribution of the unwanted assets, and the Service cites *Waterman* as authority for that proposition. We view the sham aspect—the hollow sound—of the transaction described in *Waterman* as one of the critical aspects of that decision, and we decline to extend the *Waterman* rule to a case which admittedly does not involve a sham and which, in other important respects, is factually different from *Waterman.*

The Internal Revenue Service also cites *Basic* as authority for the disallowance of dividend treatment for the distribution of the unwanted assets in this case. Basic Incorporated ("Basic") owned all the capital stock of Falls Industries Incorporated ("Falls"), which in turn owned all the stock of Basic Carbon Corporation ("Carbon"). Carborundum Company ("Carborundum") made an initial offer to acquire all the assets of Falls and Carbon. This offer failed to gel when Basic demanded that Carborundum agree to indemnify Basic for any tax assessments that might become payable on the transaction in excess of those which Basic could anticipate and compute in advance, a proposal that was unacceptable to Carborundum. Carborundum then made a second proposal to acquire directly from Basic the capital stock of Falls and the capital stock of Carbon and requested that Basic transfer the ownership of the capital stock of Carbon from Falls to Basic prior to the transaction. In order to achieve that, Falls distributed the capital stock of Carbon to Basic as a dividend, which put Basic in the position of owning the capital stock of both Falls and Carbon. The sale of such capital stock to Carborundum was then consummated. In its federal income tax return for the year involved, Basic reported dividend income from Falls in the amount of $500,000 as a result of its receipt of the capital stock of Carbon. It thereupon claimed a dividends received deduction in the amount of 85% of the dividend pursuant to § 243(a)(1) of the Code. Finally, it reported a long-term capital gain of $2,300,000 from the sale to Carborundum of the shares of Falls and Carbon. On audit, the Internal Revenue Service determined that the gain from the sale of the shares of capital stock of Falls and Carbon should be increased by the amount of the purported dividend. On those facts, the court of claims held that the distribution of the capital stock of Carbon by Falls to Basic was not a true dividend but was part of the total transaction by which Basic, in substance, sold the capital stock of Falls and Carbon to Carborundum:

> Under the facts and circumstances presented here, plaintiff has not shown that there was a reason for the transfer of the Carbon stock from Falls to Basic aside from the tax consequences attributable to that move. Accordingly, for purposes of taxation, the transfer was not a dividend within the meaning of Section 316(a)(1). Instead, it should be regarded as a transfer that avoided part of the gain to be expected from the sale of the business to Carborundum, and should, therefore, be now taxed accordingly.

*Basic,* 549 F.2d at 749. Basic was a conduit through which an asset, the capital stock of Carbon, was passed to the buyer. The substance of the transaction was a brief removal of the "dividend" asset (the Carbon stock) on the way to the hands of the waiting buyer. In the case before the court, unlike the situation that obtained in *Basic,* the distributed assets were retained by the

stockholders to whom they were distributed, rather than being immediately transferred to the purchaser.

■ As additional support for its position, the court in *Basic* focused on the absence of a business purpose, viewed from the standpoint of Falls, for the payment of a dividend of a valuable corporate asset, i. e., the capital stock of Carbon, by Falls to Basic. The district court, in the case before this court, applied the same test to the payment of the dividend of the unwanted assets by CLIC to TSN, the controlling stockholder of CLIC, and found that, strictly from the standpoint of CLIC, the dividend was lacking in business purpose and, indeed, could not have taken place apart from the sale and the subsequent infusion of investment assets into CLIC by Union Mutual. However, it seems to us to be inconsistent to take the position that substance must control over form and that a transaction must be viewed as a whole, rather than in parts, and at the same time to state that the business purpose of one participant in a multi-party transaction (particularly where the participant is a corporation controlled by the taxpayer and is not itself a party to the sale transaction) is to be viewed in isolation from the over-all business purpose for the entire transaction. We agree that the transaction must be viewed as a whole and we accept the district court's finding of fact that the dividend of the unwanted assets was "part and parcel of the purchase arrangement with Union Mutual," motivated specifically by Union Mutual's unwillingness to take and pay for such assets. That being the case, we decline to focus on the business purpose of one participant in the transaction—a corporation controlled by the taxpayer—and instead find that the business purpose for the transaction as a whole, viewed from the standpoint of the taxpayer, controls. The facts found by the district court clearly demonstrate a business purpose for the presale dividend of the unwanted assets which fully explains that dividend. We note that there is no suggestion in the district court's opinion of any tax

avoidance motivation on the part of the taxpayer TSN. The fact that the dividend may have had incidental tax benefit to the taxpayer, without more, does not necessitate the disallowance of dividend treatment.

Having concluded that the pre-sale distribution by CLIC to its stockholders (including TSN) of assets which Union Mutual did not want, would not pay for and did not ultimately receive is a dividend for tax purposes, and not part of the purchase price of the capital stock of CLIC, we reverse the judgment of the district court and remand for proceedings consistent with this opinion.

REVERSED and REMANDED.