MIDWEST SAVINGS ASSOCIATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7918–78.     Filed November 13, 1980.

*Marc W. Rubin,* for the petitioner.
*Warren R. Calvert,* for the respondent.

OPINION

EKMAN, *Judge:** Respondent determined deficiencies in petitioner's Federal income taxes for the taxable years ending

---

*By order of the Chief Judge dated July 1, 1980, this case was reassigned from Judge Darrell D. Wiles to Judge Sheldon V. Ekman.

December 31, 1969, December 31, 1970, December 31, 1971, the taxable period January 1 through September 30, 1972,[1] and the taxable year ending December 31, 1973,[2] as follows:

| Year | Deficiency |
|---|---|
| 1969 | $2,608.72 |
| 1970 | 3,177.67 |
| 1971 | 3,844.35 |
| Jan. 1 through Sept. 30, 1972 | 2,336.79 |
| 1973 | 21,022.46 |

Concessions having been made by petitioner, the sole issue remaining for decision is whether a distribution to depositor shareholders by a domestic building and loan association may be deducted under section 591, I.R.C. 1954.

All the facts have been stipulated and are so found. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference. The pertinent facts are as follows. Midwest Savings Association (hereinafter petitioner or Midwest), formerly the Evanston Building & Loan Co. (hereinafter Evanston), is a corporation organized under the laws of the State of Ohio with its principal place of business in Ohio. South Side Loan & Building Co. (hereinafter South Side), was a corporation organized under the laws of the State of Ohio with its principal place of business in Ohio. During the years in question, Evanston and South Side were domestic building and loan associations chartered and supervised as savings and loan or similar associations under the laws of the State of Ohio.

South Side filed its Federal income tax returns for the taxable years in question with the District Director of Internal Revenue, Cincinnati, Ohio. Evanston filed its Federal income tax return for its taxable year ending December 31, 1973, with the District Director of Internal Revenue, Cincinnati, Ohio.

All South Side depositors were owners of withdrawable shares which were considered stock for shareholder voting purposes

---

[1]These deficiencies were determined against Midwest Savings Association, formerly Evanston Building & Loan Co., as successor in interest to the assets of South Side Loan & Building Co.

[2]This deficiency was determined against Midwest Savings Association, formerly Evanston Building & Loan Co.

including voting for directors and all other matters reserved to the approval of shareholders under Ohio law. The bylaws of South Side designated the withdrawable shares as savings shares or investment shares and provided that all deposits evidenced by such shares were entitled to receive dividends out of earnings.

Evanston was owned by those of its depositors who were holders of savings share or investment share accounts. However, Evanston also had deposit accounts which had no ownership rights. The Evanston savings share and investment share account holders had voting and dividend rights similar to those of South Side share account holders.

By letter to South Side dated February 9, 1972, Evanston proposed a merger of South Side into Evanston. Therein, Evanston suggested that South Side distribute a 4-percent bonus payment to its share account holders prior to the merger. The proposed merger was in due course submitted to the shareholders and directors of each institution and duly approved. On September 27, 1972, an agreement of merger between Evanston and South Side was filed with the secretary of state of Ohio, to be effective as of the close of business on September 30, 1972. Midwest Savings Association, formerly Evanston,[3] is the successor in interest to the assets and liabilities of South Side.

Pursuant to the agreement of merger, each holder of withdrawable shares in South Side was offered the choice of one of the following options or any combination thereof in converting his account to an account in Evanston:

*Option One:* To convert a withdrawable savings share or investment share account of The South Side Loan and Building Company, together with a bonus distribution in an amount equal to 4% of said account as the same existed as of February 7, 1972, into a like account in The Evanston Building and Loan Company.

*Option Two:* To be paid in cash the amount of withdrawable savings share or investment share account plus accrued dividends to the date of merger, plus a bonus distribution equal to 4% of said account as the same existed as of February 7, 1972.

*Option Three:* To convert a withdrawable savings share or investment share account of The South Side Loan and Building Company in part to a like

---

[3]The record does not make clear whether the change from Evanston to Midwest Savings Association was a change in name only. In any case, the parties are in agreement concerning Midwest's liability for any deficiencies determined herein.

account in The Evanston Building and Loan Company, and to have the privilege of withdrawing any balance, together with a bonus distribution in an amount equal to 4% of said account as the same existed as of February 7, 1972.

During business hours on September 30, 1972, and thus, prior to the merger, savings share account holders of South Side were credited with a 4-percent bonus distribution on the books of South Side. Investment share account holders were issued a 4-percent bonus distribution by checks of South Side. These distributions, totaling $137,069.28, were charged to the undivided profits account of South Side.

South Side had regularly declared semiannual dividends payable on March 31 and September 30 of each year, and during 1972, South Side declared regular dividends on its shareholder accounts payable on March 31, and September 30, 1972. The deductibility of these distributions is not at issue.

In its Federal income tax return for the taxable period January 1, 1972, through September 30, 1972, South Side deducted $137,069.28 under section 591 for the bonus distribution credited or paid to depositor shareholders on September 30, 1972. Respondent disallowed the deduction for the bonus distribution and thus eliminated the carryback of South Side's net operating loss from the period January 1 to September 30, 1972, to the taxable years 1969, 1970, and 1971. A net operating loss carryover in the amount of $56,784.68, claimed by Evanston during 1973, was similarly disallowed.

Although this Court has previously considered the provisions of section 591, I.R.C. 1954,[4] we have not heretofore been called upon to address the particular question raised by this case. There is no dispute as to the material facts, and the issue is one purely of statutory interpretation.

A review of the history of section 591 may provide some perspective. Under the 1939 Code, domestic building and loan associations were exempt from Federal income taxation. Sec.

---

[4]Sec. 591 provides:

DEDUCTION FOR DIVIDENDS PAID ON DEPOSITS.

In the case of mutual savings banks, cooperative banks, domestic building and loan associations, and other savings institutions chartered and supervised as savings and loan or similar associations under Federal or State law, there shall be allowed as deductions in computing taxable income amounts paid to, or credited to the accounts of, depositors or holders of accounts as dividends or interest on their deposits or withdrawable accounts, if such amounts paid or credited are withdrawable on demand subject only to customary notice of intention to withdraw.

101(4), I.R.C. 1939. That tax exemption was removed by section 313 of the Revenue Act of 1951, but section 23 of the 1939 Code was simultaneously amended to provide that mutual banks, savings and loan associations, and domestic building and loan associations might deduct dividends paid to depositors. The 1951 amendment, section 23(r)(1) of the 1939 Code, was continued substantially unchanged as section 591 of the 1954 Code. In the Revenue Act of 1962, section 591 was amended, first, to make clear that the benefits of the deduction extended to any savings and loan institution, chartered and supervised as such under Federal or State law, and second, to add to the preexisting deduction for dividends paid to depositors the words "or interest." See S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 707, 755.

In *Hudson City Savings Bank v. Commissioner*, 53 T.C. 70, 74–75 (1969), we reviewed the legislative history of section 591 and described the interrelationship between the various code provisions involved as follows:

As petitioner has acknowledged, the stated purpose of section 313 of the Revenue Act of 1951, which contained the predecessor provisions of section 591, was to change the tax-exempt status of mutual savings banks. Until 1951 they had enjoyed a competitive advantage over commercial banks. Instead of distributing profits to depositors, mutual savings banks had accumulated large reserves from which they financed their rapid growth, tax free. S. Rept. No. 781, to accompany H.R. 4473 (Pub. L. 183), 82d Cong., 1st Sess, p. 24, 25 (1951); 97 Cong. Rec. 11841–11842 (1951) (remarks of Senator Kerr on H.R. 4473). The result was that profits were not being taxed either in the hands of the institutions or in the hands of the depositors.

In operation the provisions of the 1951 Revenue Act have left mutual savings banks untaxed because interest and dividends paid to depositors are deductible under section 591 and because of the generous limits on bad debt reserves under section 593. H. Rept. No. 1447, to accompanying H.R. 10650 (Pub. L. 87–834), 87th Cong., 2d Sess., p. 32 (1962). But by establishing ceilings on additions to untaxed reserves under section 593, and by forcing distributions to depositors under section 591 in lieu of paying taxes on the amounts, the aim and effect of the provisions is consistent with the criticism initially voiced against these institutions.

It is the threat of taxation which forces the distribution of interest to depositors. Section 591 merely allows the deduction. Petitioner argues that section 163(a) allows the same deduction in more general terms. But section 591 is specifically directed to "the case of mutual savings banks." In addition, by requiring, unlike section 163(a), that the interest be "withdrawable on demand," section 591 allows a mutual savings bank a deduction only when the interest becomes taxable in the hands of the depositors. Under section 163(a) a bank could deduct accrued interest although the depositors might have no right

to it (and no tax to pay on a cash basis) until termination of their accounts. The bank would again have the complete use of untaxed reserves, a situation against which the 1951 provisions were directed. The interest of the depositors in the growth of their mutual savings bank makes this speculation not unlikely. *Finally, the "interest" paid by mutual savings banks is more than the interest paid for the use of deposits. It is also a distribution of profits, and to that extent is unlike the "interest" normally deducted by commercial banks under section 163(a).* * * * [Emphasis supplied.]

Petitioner contends that the 4-percent bonus distribution paid or credited by South Side to share account holders on September 30, 1972, is fully deductible under the clear language of section 591.

Respondent's primary argument in support of his disallowance of the deduction at issue is that the distribution by South Side was not the type of distribution which Congress intended to be deductible under section 591. Dividends paid by building and loan associations possess characteristics both of corporate dividends paid to stockholders and interest payments made by commercial banks to depositors. Respondent contends that Congress recognized that such dividend payments were closely akin to interest payments by commercial banking institutions to depositors and that the principle underlying enactment of section 313 of the Revenue Act of 1951 was to provide tax parity between commercial banks and building and loan associations and similar institutions. Tax parity was to be effectuated, first, by abolishing the tax exemption enjoyed by building and loan associations, and second, by providing them with a deduction for dividends in the same manner as commercial banks are allowed a deduction for interest payments under section 163(a). Therefore, argues respondent, if a distribution is made by a building and loan association, the circumstances surrounding the distribution must be closely scrutinized. If the distribution is made under circumstances which are not analogous to those under which an interest payment is made by a commercial bank, no deduction is allowable under section 591. Respondent, of course, argues that the bonus distribution in the instant case was not made under circumstances analogous to those surrounding an interest payment. Consequently, respondent concludes that the bonus payment by South Side is not deductible under section 591.

As part of his argument, respondent urges this Court to view the payments to the share account holders of South Side as paid by Evanston as part of the purchase price of the assets of South

Side pursuant to the merger agreement between Evanston and South Side and added to Evanston's basis in those assets.[5] We hold such characterization to be improper.

In so holding, we are not unmindful of the doctrine that the substance of a transaction governs its taxation. *Reitz v. Commissioner*, 61 T.C. 443, 446 (1974), affd. without opinion 507 F.2d 1279 (5th Cir. 1975). A distribution which is cast in the form of a dividend but which is in substance a portion of the purchase price paid for a corporation, is treated for tax purposes according to its substantive character. *Waterman Steamship Corp. v. Commissioner*, 430 F.2d 1185 (5th Cir. 1970), revg. 50 T.C. 650 (1968), cert. denied 401 U.S. 939 (1971); *Steel Improvement & Forge Co. v. Commissioner*, 314 F.2d 96 (6th Cir. 1963), revg. 36 T.C. 265 (1961).

Neither of the parties has favored us with evidence concerning negotiations between Evanston and South Side preceding the merger proposal contained in Evanston's letter of February 9, 1972. Nevertheless, the inference is obvious, based on the tenor of that letter, that such negotiations occurred and that the bonus distribution was discussed during the negotiations. Further, the bonus distribution was suggested by Evanston in its letter containing the merger proposal. However, we do not think this set of facts and inferences warrants characterization of the distributed amounts as a portion of the purchase price paid by Evanston for the assets of South Side.

The distribution was declared prior to the merger by a vote of the South Side share account holders and paid or credited to those share account holders prior to the merger. The amounts distributed were subject to withdrawal on demand by the account holders, and, in some cases, amounts were withdrawn from the savings share accounts after such accounts were credited with the distribution and prior to the merger of South Side into Evanston. The share account holders had complete dominion and control both prior to and after the merger over the amounts distributed. Moreover, the payment was made from the funds of South Side and charged against the earnings and profits of South Side.

---

[5]Respondent cites Rev. Rul. 72–524, 1972–2 C.B. 283, as his sole support for this position. That ruling is factually different from, and thus inapposite to, the instant case, and accordingly, we express no opinion as to its correctness.

Respondent has not asserted that the bonus distribution was a sham. Indeed, we perceive no sham aspect in the transaction. See *TSN Liquidating Corp., Inc. v. United States*, 624 F.2d 1328, 1335 (5th Cir. 1980).

Concerning respondent's primary argument—that a deduction under section 591 is allowable only if the payment is analogous to interest paid by a commercial bank—we initially note that respondent appears to have the order of legislative development reversed. Congress first determined that institutions like petitioner should be forced to distribute their accumulated profits. Accordingly, in the 1951 Act, Congress removed the tax exemption of such institutions and granted them a deduction for "dividends" paid to depositors. Not until the 1962 Act did Congress broaden the language of section 591 by adding the words "or interest." We are therefore totally unmoved by respondent's contention that a deduction for dividends under section 591 is allowable only if the dividend is analogous to interest paid by a commercial bank.[6]

Moreover, we have searched the legislative history without success for a scintilla of support for respondent's position. Congress employed the word "dividend" without modification, limitation, or diminution, and the record is bare of any purported intent that only dividends akin to interest were in the minds of the writers of the statute. With this background, we are hard pressed to read into the statute any definition of dividend other than the customary definition contained in section 316 of the Code and in respondent's regulation thereunder.[7] This definition

---

[6]Respondent argues that the implicit intent of Congress to limit the definition of dividends under sec. 591 is evidenced by the treatment of such dividends, under other sections of the Code, in a manner comparable with the treatment of interest payments. Thus, dividend payments under sec. 591 are excluded from treatment as a dividend under sec. 243(c)(1) and treated as interest payments under secs. 116(c)(1) and 6049(b)(1). Rather than support respondent's argument, the specific limitations imposed by the cited sections of the Code appear to us to underscore a congressional intent that the term "dividend" as used in sec. 591 is to be accorded its ordinary meaning as defined in sec. 316, except where the Code expressly ordains otherwise.

[7]Sec. 1.316-1(a)(1), Income Tax Regs., provides in pertinent part:

"The term · "dividend" for the purpose of subtitle A of the Code * * * comprises any distribution of property as defined in section 317 in the ordinary course of business, even though extraordinary in amount, made by a domestic or foreign corporation to its shareholders out of either—

"(i) Earnings and profits accumulated since February 28, 1913, or

"(ii) Earnings and profits of the taxable year computed without regard to the amount of the

extends to any distribution of property "even though extraordinary in amount" made out of earnings and profits. We believe that the 4-percent bonus distribution paid or credited by South Side to its depositors on September 30, 1972, was a dividend and, since it was made by an institution described in section 591, was distributed to the account of a depositor or a holder of a withdrawable account, and was withdrawable on demand subject only to customary notice of intent to withdraw, it meets the prerequisites to deductibility set forth in section 591 and is accordingly deductible under that section.[8]

We agree with petitioner that in effect respondent asks this Court to construe section 591 to contain a condition in addition to those spelled out within the section. To limit a deduction under section 591 based on an interpretation of the implicit intent of the legislature is to exercise authority not granted to this or any other Court. "We were not given the responsibility of writing statutes, but we do have the responsibility of interpreting them as we find them." *Estate of Miller v. Commissioner*, 48 T.C. 251, 264 (1967); *Verito v. Commissioner*, 43 T.C. 429, 443 (1965). If we were to interpret section 591 as requested by respondent, we would not be construing the statute but, rather, rewriting it. We find no authority or reason in either the legislative history or elsewhere to construe section 591 in a manner other than what appears to us to be required by the clear meaning of the words used in the statute.

It is not without significance that from 1951 to 1962, Congress saw no reason to limit or even to define the term dividend as used in section 591, and we can only surmise that the addition of the words "or interest" in 1962 was not intended as a limitation of the existing language but, rather, as a liberalization to make clear the deductibility of distributions of profits, whether denominated dividends or interest. *Hudson City Savings Bank v. Commissioner*, 53 T.C. 70 (1969). But even that surmise is not for us to make. "The underlying issue is whether we should take the

---

earnings and profits (whether of such year or accumulated since February 28, 1913) at the time the distribution was made."

[8]Respondent has not raised, and we do not address, the issue of whether the amounts paid to investment shareholders by check dated Sept. 30, 1972, were paid during the taxable period Jan. 1, 1972, through Sept. 30, 1972, within the purview of sec. 591. See *Citizens Federal Savings & Loan Assn. of Covington v. Commissioner*, 30 T.C. 285 (1958); *Hancock County Federal Savings & Loan Assn. v. Commissioner*, 32 T.C. 869 (1959).

legislation as clearly written by the Congress or whether we should in effect read the statute on the basis of what Congress might have, possibly should have, but has not written into the legislation. We decline to engage in what amounts to judicial legislation." *International Trading Co. v. Commissioner,* 484 F.2d 707, 708 (7th Cir. 1973), revg. and remanding 57 T.C. 455 (1971). We therefore decline respondent's invitation to engage in judicial legislation.

Due to concessions by the petitioner,

*Decision will be entered under Rule 155.*