*Decision will be entered under Rule 155.*

CLARENCE J. MONSON AND MILDRED R. MONSON,[1] PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11432–80.     Filed November 18, 1982.

---

[1]The record shows that Mr. Monson died on Sept. 29, 1980. However, no change has been made in the caption of the case.

*Richard L. Kintz* and *Paul R. Wassenaar*, for the petitioners.
*M. K. Mortensen*, for the respondent.

SCOTT, *Judge*: Respondent determined a deficiency in petitioners' income tax for the calendar year 1976 in the amount of $71,296. By amendment to his answer, respondent claimed on an alternative basis an increase in the deficiency determined to $87,236.

The issues for decision are: (1) Whether petitioners are entitled to report the gain on the sale by Mr. Monson of 259 shares of stock of Monson Truck Co. on an installment basis under section 453(b)[2] when 3 days prior to the sale the corporation had redeemed 122 shares of Mr. Monson's stock for an amount in excess of 30 percent of the selling price of the 259 shares plus the redemption price of the 122 shares; (2) if the redemption of stock and the sale of stock are treated as two separate transactions for the purpose of determining whether the amount received in the year of sale of the stock exceeded 30 percent of the selling price of that stock, is the redemption to be treated as an exchange under section 302(a) or is the amount received on the redemption to be treated as a dividend; and (3) if the redemption and sale of the stock are treated as one transaction so that petitioners are not entitled to report the gain on the installment basis, should the note received upon the sale of the 259 shares of stock be included in the price received for the stock at its full face amount or at some discounted amount because its fair market value was less than its face amount.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Clarence J. Monson and Mildred R. Monson, during the year 1976 and at the date of the filing of the petition in this case, were husband and wife who resided in San Diego, Calif. Mr. and Mrs. Monson filed a joint Federal income tax return for the calendar year 1976.

Prior to January 1, 1976, and during the period January 1,

---

[2]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the year here in issue.

1976, through July 29, 1976, Clarence J. Monson (petitioner) was the owner of 381 shares of the 450 shares of the issued and outstanding stock of Monson Truck Co. Petitioners' children were the owners of the remaining 69 shares of the Monson Truck Co. stock.

On July 30, 1976, Monson Truck Co. redeemed the 69 shares of stock held by petitioners' children and 122 shares of stock held by petitioner. The redemption price of the stock was $1,148.14 per share. Petitioner received a total amount of $140,073.08 for the 122 shares of his stock redeemed. On that same date of July 30, 1976, a special meeting of the board of directors of Monson Truck Co. had been held at 11 a.m. The minutes of the meeting state in part as follows:

> Clarence J. Monson, president of the corporation, presided. The president stated that all of the stockholders of the corporation, to wit: Clarence J. Monson, Susan Carol Bailey, Dian Ruth DiScala, and Michael John Monson proposed to sell all of their shares of stock of the corporation to a third party, namely, Duane Campbell, and that as a part of and concurrent with the said sale it was proposed that the corporation redeem 23 shares of stock of the corporation from each of Susan Carol Bailey, Dian Ruth DiScala, Michael John Monson and 122 shares from Clarence J. Monson.
>
> The president outlined the proposed redemption price and the method of payment that had been discussed and agreed upon by the stockholders subject to the approval by the corporation.
>
> After further discussion the following resolutions were duly made and unanimously adopted:
>
> RESOLVED: That this corporation redeem 23 shares of its stock from each of Susan Carol Bailey, Dian Ruth DiScala, and Michael John Monson and 122 shares from Clarence J. Monson.
>
> RESOLVED FURTHER: That the redemption price shall be $1,148.14 per share * * *
>
> \*    \*    \*    \*    \*    \*    \*
>
> RESOLVED FURTHER: That this redemption is a part of and concurrent with a sale by Clarence J. Monson, Susan Carol Bailey, Dian Ruth DiScala and Michael John Monson of all of their shares of stock of the corporation to Duane Campbell.

After the redemption on July 30, 1976, petitioner owned all of the remaining issued and outstanding stock of Monson Truck Co., which consisted of 259 shares. On August 2, 1976, petitioner sold the 259 shares of Monson Truck Co. stock to Duane M. Campbell. The stock purchase agreement provided that the purchase price of the stock was $297,368, or $1,148.14 per share. This amount was to be paid by a payment of $35,000

in cash and the giving of a promissory note for $262,368. The agreement contained the following provisions:

The Corporation has heretofore had a total of 450 shares of its stock issued and outstanding of which 191 shares have been redeemed by the Corporation as a part of this transaction.

The stock purchase agreement was signed by petitioner and by Mr. Campbell.

On August 2, 1976, Mr. Campbell paid petitioner $35,000 in cash and gave him a promissory note for $262,368, secured by the stock of Monson Truck Co. and also by a security agreement which provided that the corporation granted to petitioner a security interest in the equipment and inventory owned by the corporation. The note provided for monthly payments of $5,069.15 or more per month on the first day of each month commencing September 1, 1976, with interest at the rate of 8 percent per annum. The note further provided that the monthly payments included the interest, and all sums over and above the accumulated interest at the time of any payment should be applied to principal. The note further provided that, notwithstanding the right of the maker to make monthly payments in an amount greater than the specific amount set forth, it was understood that the maximum principal payment that might be made on the note prior to January 2, 1977, was $51,368.26. Actually, $44,882 was paid on the principal of the note during the year 1976, making a total of $79,882 received by petitioner from Mr. Campbell in 1976 in connection with Mr. Campbell's purchase of the 259 shares of stock.

As of a few years prior to 1976, petitioner decided that he wished to retire from the trucking business because of his age and poor health and that he wanted to sell the business in order to enable him to retire. Approximately 2 years prior to the actual sale, some individuals from Texas had shown an interest in purchasing the business but wished to purchase all of the stock largely financed by a note. Petitioner had turned down the opportunity to sell to the individuals from Texas because he did not want to receive almost the entire purchase price of the stock in the form of a note.

Mr. Campbell had been operating a trucking company, Campbell Trucking Co., for approximately 25 years prior to 1976. He was the sole owner of the stock of that company. The

company had a net worth of approximately $120,000. Petitioner approached Mr. Campbell with the proposition that Mr. Campbell purchase the stock of Monson Truck Co. after redemption of sufficient shares of the company to remove most of the cash which the company had. Mr. Campbell's primary interest in purchasing the stock of Monson Truck Co. was to obtain its assets. These assets included, among others, tractors, trailers, and an ICC franchise. The assets had a fair market value in 1976 of between $400,000 and $450,000. The 8-percent interest rate offered to Mr. Campbell on the note was less than the current interest on notes secured by corporate stock or equipment. The current rate on notes secured by stock or equipment was between 10 and 11 percent. No suggestion was made to Mr. Campbell that he pay cash at the time of purchase of the stock in excess of the amount he paid. However, Mr. Campbell would not have been able to pay more than approximately one-half of the $297,368 price of the 259 shares of stock in cash had he been requested to pay more cash. In order to have paid that amount, it would have been necessary for Mr. Campbell to either borrow on or sell his interest in Campbell Trucking Co. Mr. Campbell, in addition to his Campbell Trucking Co. interest, had two condominiums which in mid–1976 had a value of approximately $125,000, each.

Petitioners on their Federal income tax return for 1976 reported on part II of Schedule D, Capital Gains and Losses, a sale of 122 shares Monson Truck Co. at a sales price of $140,073, resulting in a long-term capital gain of $127,873. Immediately above the reporting of the sale of these shares was a notation "See Statement 3." Statement 3, attached to the return, was entitled "Gain on Installment Sales—Capital Assets." The property sold was described as 259 shares of common stock of Monson Truck Co. The selling price was shown as $297,368 of which $35,000 was paid in cash and $262,368 in notes. There followed a computation of the gross profit ratio and the gain to be reported for the current year. Payments received in the current year were shown as $79,882.

Respondent in his notice of deficiency to petitioners determined that the total selling price of the Monson Truck Co. stock sold by petitioner in 1976 was $437,441, consisting of the cash and note paid for the 259 shares purchased by Mr. Campbell and the $140,073 paid in redemption of the 122

shares. On this basis, respondent determined that petitioners had a long-term capital gain from the sale of the Monson Truck Co. stock in 1976 of $397,210. After the 50-percent deduction provided for in section 1202, respondent determined that petitioners had a taxable amount of capital gain of $198,576, or an increase in the capital gain income shown on their return of $98,493. Respondent explained his adjustment to petitioners' reported capital gain as follows:

It is determined that you realized a long-term capital gain of $397,210.00 from the sale of the business known as Monson Truck Company, by the sale and redemption of that Company's capital stock. This sale does not qualify as an installment sale as greater than 30% of the selling price was received in the year of sale. The gain is taxable subject to the 50% deduction provided by section 1202 of the Internal Revenue Code. * * *

Respondent, by amended answer, alleged that if it were determined that petitioner made two separate sales, one of the stock redeemed and the other of the stock sold to Mr. Campbell, the amount received upon the redemption was not to be treated as an amount received in an exchange under section 302(a) but rather as a distribution to petitioner from Monson Truck Co. essentially equivalent to a dividend. By an amendment to their petition, filed at the trial, petitioners alleged in the alternative that if the sale of the stock to Mr. Campbell did not qualify for treatment as an installment sale under section 453(b), the Commissioner erred by including the entire face value of the note as a part of the sales price of the stock since at the time the note was received it had a fair market value less than its face value and should be appropriately discounted.

## OPINION

Both parties here agree that, if the redemption of petitioner's 122 shares by the corporation and his subsequent sale of the remaining stock in the corporation were so interrelated as to be found to constitute an integrated transaction, the redemption was either not essentially equivalent to a dividend under section 302(b)(1) or a complete termination of petitioner's proprietary interest in the corporation under section 302(b)(3). Respondent further contends, however, that assuming such interrelation of the redemption and the sale, the two should be treated as one sale for the purpose of section 453. If

the redemption and sale are treated as one sale, that sale does not qualify as an installment sale under section 453(b) as applicable to the year here in issue since the cash and other property received by petitioner in the year of sale is in excess of 30 percent of the combined selling price and redemption price. It is petitioner's position that although the redemption and sale were a part of the same transaction in that it was Mr. Monson's intent to dispose of all of his stock in Monson Truck Co., the redemption and sale to Mr. Campbell were structured and are to be treated as two separate sales for the purposes of section 453(b). Petitioner points out that one "sale," the redemption, was to a different party than the other sale. Petitioner states that the corporation was the purchaser of the shares redeemed whereas Mr. Campbell was the purchaser of the remaining shares. It is petitioner's position that this fact is sufficient to cause the two transactions to be separate sales for the purposes of section 453(b). If the redemption and the sale to Mr. Campbell are treated as constituting two sales, the record is clear that the sale to Mr. Campbell met the requirements for an installment sale under section 453.

Section 453(b),[3] as applicable to the year 1976, provided that a casual sale of personal property for a price exceeding $1,000 might be returned on the installment basis if the payments, exclusive of evidences of indebtedness of the purchaser, in the

---

[3]Sec. 453(b) reads in in part as follows:

SEC. 453. INSTALLMENT METHOD.
  (b) SALES OF REALTY AND CASUAL SALES OF PERSONALITY.—
    (1) GENERAL RULE.—Income from—
      (A) a sale or other disposition of real property, or
      (B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000,
may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).
    (2) LIMITATION.—Paragraph (1) shall apply—
      (A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition—
        (i) there are no payments, or
        (ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 per cent of the selling price.
      (B) In the case of a sale or other disposition during a taxable year beginning before January 1, 1954, only if the income was (by reason of section 44(b) of the Internal Revenue Code of 1939) returnable on the basis and in the manner prescribed in section 44(a) of such code.

year of the sale did not exceed 30 percent of the selling price. The sale of the stock of Monson Truck Co. by petitioner was clearly a casual sale of personal property. The only area of disagreement between the parties is whether the payments exclusive of evidences of indebtedness of the purchaser received by petitioner in the year of sale exceeded 30 percent of the selling price. The determination of this issue depends on whether the redemption and the sale to Mr. Campbell are viewed as one sale or as two separate sales.

In our view, there is no question that the sale and redemption were interrelated transactions. The minutes of the special meeting of the board of directors of Monson Truck Co. authorizing the redemption specifically provided that the redemption "is a part of and concurrent with a sale" of stock of the corporation to Duane Campbell. The stock purchase agreement signed by Mr. Campbell and petitioner stated that 191 shares of stock of the corporation "have been redeemed by the Corporation as a part of this transaction." Mrs. Monson, at the trial, specifically testified with respect to the two transactions that one was contingent on the other.

The record also shows that petitioner was desirous of obtaining substantial cash from the sale of the stock. He was in poor health and wished to leave the trucking business. It was his intent to use the money received from the sale of the stock to invest to produce income for the support of himself and his wife.

Since if the redemption of petitioner's stock did not constitute a sale of that stock,[4] but rather resulted in petitioner's receipt of a dividend, the sale to Mr. Campbell clearly meets the requirements of section 453(b), we consider it appropriate to address respondent's alternative contention first. It is too obvious to warrant discussion that if the only sale of stock by petitioner in 1976 was the sale of the 259 shares to Mr. Campbell, that sale was an installment sale within the provisions of section 453(b).

Section 302(a) provides that if a redemption qualifies under

---

[4] A redemption of stock which is not essentially equivalent to a dividend is treated as a sale of the stock for purposes of sec. 453. See *Mercedes Frances Freeman, et al., Trust v. Commissioner*, 36 T.C. 779, 782, 786 (1961), affd. 303 F.2d 580 (8th Cir. 1962). As pointed out in that case at 786, the purchaser of the shares is the corporation.

any of the paragraphs of section 302(b), such redemption shall be treated as a payment in exchange for the stock. However, as was pointed out in *United States v. Davis*, 397 U.S. 304, 308 (1970), where a sole stockholder causes part of his shares to be redeemed by the corporation, the redemption "is always 'essentially equivalent to a dividend' within the meaning of that phrase in section 302(b)(1)." Since petitioner is considered as the owner of the shares of Monson Truck Co. owned by his children, he was the sole shareholder of Monson Truck Co. both before and after the redemption of his 122 shares of stock. Therefore, unless the redemption is considered so related to the sale of the balance of his stock as to cause a termination of his interest in the company, the amount received on the redemption is a dividend and the redemption is not considered as a sale of the stock. However, if the redemption of the 122 shares of stock is considered as a termination of petitioner's interest in Monson Truck Co., it is a sale of his stock to the company. *Mercedes Frances Freeman, et al., Trust v. Commissioner*, 36 T.C. 779, 782, 786 (1961), affd. 303 F.2d 580 (8th Cir. 1962).

In *Zenz v. Quinlivan*, 213 F.2d 914 (6th Cir. 1954), the court held that where a taxpayer sold a part of her stock for cash and 3 weeks later the corporation redeemed the balance of her stock, the redemption was not essentially equivalent to a dividend since it terminated the taxpayer's interest in the corporation. In the *Zenz* case, the transaction was planned as it was because the taxpayer was desirous of disposing of her stock but the buyer did not want to purchase the stock of a corporation with the amount of accumulated earnings that was then in the corporation. To remove most of the accumulated earnings, the transaction was structured as a sale of part of the taxpayer's stock to the third-party buyer and, thereafter, a redemption by the corporation of the balance.[5] As respondent points out, the transaction involved in the *Zenz* case was a sale of part of the stock and subsequent redemption of the balance. However, the rationale of the case is not based on the fact that

---

[5]Respondent acquiesced in the *Zenz* case and in Rev. Rul. 54–458, 1954–2 C.B. 167, announced that the decision in that case would be followed by the Service. Later, in Rev. Rul. 55–745, 1955–2 C.B. 223, respondent announced that the holding in *Zenz* would also apply to similar situations arising under sec. 302(b)(3), I.R.C. 1954. See also sec. 1.311–2(b)(1), Income Tax Regs.

the sale preceded the redemption but rather on the fact that the intent of the taxpayer was "to bring about a complete liquidation of her holding and to become separated from all interest in the corporation." *Zenz v. Quinlivan, supra* at 917. It was this fact on which the court based its conclusion that the distribution of the earnings and profits of the corporation in payment for the stock was not made at such time and in such manner as to make the distribution in redemption essentially equivalent to the distribution of a taxable dividend. In *United States v. Carey*, 289 F.2d 531 (8th Cir. 1961), the court held that a redemption of a portion of a taxpayer's shares of stock in a corporation, as a part of an overall plan for him to withdraw from the corporation prior to the sale of the balance of his shares, was not essentially equivalent to a dividend within the meaning of section 302(b)(1). The facts in the *Carey* case show that two individuals owned an automobile business. One of them devoted full time to the business and the other only part time. The individual who devoted only part time to the business agreed to sell his stock to someone who could devote full time to the business. Since a purchaser who could pay the total cash price for the taxpayer's stock was not found, it was agreed that the corporation would redeem 145 shares of the 300 shares owned by the taxpayer, and, after the redemption, the prospective purchaser would buy the remaining 155 shares of that stock for cash. This transaction was carried out as planned. The court concluded that because the redemption of the stock was part of an overall plan to terminate the taxpayer's interest in the corporation, the redemption, though preceding the sale, was not essentially equivalent to a dividend. The court pointed out, at page 537, that the question of whether a distribution in redemption of stock is essentially equivalent to a dividend has been frequently considered as one of fact depending on the circumstances of each case.

The *Carey* case was, of course, decided prior to the holding of the Supreme Court in the *Davis* case that the redemption of part of the stock of a sole stockholder of a corporation is always essentially equivalent to a dividend within the meaning of section 302(b)(1). However, in our view, the Supreme Court in the *Davis* case did not intend to change the result that might be reached in a case where the redemption of some of a "sole" shareholder's stock was part of an integrated plan

to dispose of that shareholder's entire actual and constructive stock interest. Petitioner in this case, after considering the constructive ownership provisions of section 318, neither owned actually nor constructively any stock in the corporation after completion of the transaction.[6]

As we pointed out above, this record is completely clear that the redemption of petitioner's stock was part of an overall plan to terminate his entire interest in Monson Truck Co. On the basis of the facts here present, we find that, since the redemption of the 122 shares of petitioner's stock was a part of an overall plan to dispose of all of his stock in Monson Truck Co., such redemption was either a complete termination of interest under section 302(b)(3) or was not essentially equivalent to a dividend under section 302(b)(1). Therefore, under section 302(a), the redemption of the 122 shares of stock is to be treated as a sale of that stock to the corporation, Monson Truck Co.

Having concluded that the redemption and sale of petitioner's stock was an overall transaction to dispose of all of his stock in Monson Truck Co., it is necessary to determine whether the two sales, the sale of the 122 shares to the corporation in the redemption and the sale of the 259 shares 3 days later to Mr. Campbell, must be aggregated and treated as a single sale for the purposes of determining whether the 30-percent limitation of section 453(b) has been met. The only cases that have been called to our attention, or that we have found dealing specifically with the issue of whether a transaction which was structured as two separate, but nevertheless interrelated, sales should be considered as one sale for the purpose of determining the 30-percent limitation of section 453(b), are *Pritchett v. Commissioner,* 63 T.C. 149 (1974); *Farha v. Commissioner,* 58 T.C. 526 (1972), affd. 483 F.2d 18 (10th Cir. 1973); and *Collins v. Commissioner,* 48 T.C. 45 (1967). The

---

[6]In this connection, it should be noted that respondent in Rev. Rul. 75-447, 1975-2 C.B. 113, 114, reaffirmed his agreement with the holding in *Zenz v. Quinlivan,* 213 F.2d 914 (6th Cir. 1954), and stated that, relying on the *Zenz* case, "the sequence in which the events (that is, the redemption and sale) occur is irrelevant as long as both events are clearly part of an overall plan." Rev. Rul. 75-447 also states that "in situations similar to that in *Zenz,* the amount received by the shareholder from the corporation will be treated as received in payment for the stock surrendered under section 302(a) of the Code since the transaction when viewed as a whole results in the shareholder terminating his interest in the corporation within the meaning of section 302(b)(3)."

*Pritchett* and *Collins* cases dealt with two separate sales of real property.

In concluding in the *Farha* case that the transaction should be treated as one sale, we pointed out that numerous cases stood for the proposition that in the matter of taxation where various steps are employed to achieve an end which could have been achieved through one transaction, and the intermediate steps lacked independent significance of their own, the series of steps will be considered as merely component parts of one transaction. However, in the *Farha* case, we relied heavily on the fact that the sales price of the purported sale of certain shares of stock on August 19, 1967, was at $50.78 per share whereas the redemption price less than a month later was $192.57 per share. We stated that, because there was no explanation for this discrepancy in the fully stipulated case, we would not accept these values and would reconstruct the per share value at the time of sale, allocating at least some part of the amount purportedly paid in redemption of the stock to the price of the stock previously sold. When this was done, the cash deemed received in the stock sale exceeded the 30-percent test of section 453(b)(2), even if such sale were considered to be separate. In that case, we pointed out, at page 534, that—

petitioners have not shown any independent purpose sufficient to justify the short-lived retention by them of 20 percent of the corporation's stock. Since they have failed to reveal any reasonable nontax motive for dividing the disposition of their entire interest in the corporation into two steps, we have no course but to adopt respondent's characterization of the two steps as a single sale.

The facts in the instant case are quite different from those in the *Farha* case. Here, the redemption price of the 122 shares of stock was the same as the sales price of the 259 shares of stock to Mr. Campbell. Petitioner wished to have some of the cash out of the corporation since Mr. Campbell was primarily interested in acquiring the corporate assets. Certainly, on these facts, we are aware that petitioner also wished to structure the sale to Mr. Campbell in a manner to be able to report the gain under the installment method. This is shown by the provision prohibiting Mr. Campbell from paying in excess of 30 percent of the sales price of the 259 shares of stock in the year of sale. Although there is no direct evidence to that

effect in the record, we do not doubt that the redemption of some of the stock by the corporation 3 days prior to the sale of the balance to Mr. Campbell was motivated not only by the desire of petitioner to remove cash from the corporation but also by his desire to report the sale of the 259 shares on an installment basis.

The factual situation here, however, is very different from that in the *Farha* case. In the *Farha* case, we stated that the question of whether the transaction was one or two sales was one of fact. Because of the factual differences in the *Farha* case and the instant case, we do not consider the *Farha* case to be controlling in the instant case.

The *Pritchett* and the *Collins* cases each deal with a sale of contiguous tracts of real estate in separate transactions. In both of these cases we held, under the circumstances present, that, for the purposes of the 30-percent limitation of section 453(b), two sales had occurred. In both, we stated that the question was largely one of fact. The facts in the *Pritchett* case show that the taxpayer had, on the same date, made sales of two contiguous parcels of land to the same purchaser, using separate sales instruments. If the two sales were considered as one, the 30-percent limitation was met. However, if the two sales were considered separately, only one of the sales met the 30-percent limitation because, in the other, the purchaser had assumed a mortgage on the property, which was considered as a part of the payment in the year of sale in determining whether in excess of 30 percent of the selling price had been paid in the year of sale. The taxpayer argued that since the properties were contiguous and sold to the same purchaser, the two sales should be treated as one. Respondent, in his notice of deficiency, treated the two sales as separate sales and therefore determined that the installment sale method could only be applied with respect to one of the sales. In making our determination that the two sales were separate sales for the purpose of section 453(b), we stated that we did not question petitioner's testimony that he considered the two parcels of real estate as one tract and that he would not have sold one parcel without selling the other. We also recognized the fact that the two options given to the purchaser on the separate parcels were exercisable only simultaneously. However, we concluded both from the wording of the statute and from the

circumstances involved that in fact two sales had been made. We pointed out (63 T.C. at 170) that the statute is not couched in terms of the income received from one transaction in real property but rather in terms of the income received from a sale of real property. We stated (63 T.C. at 171) that the statute clearly contemplates that when two parcels of real property are sold, using separate documents to witness the transfers, the accounting for purposes of section 453 must be made as to each separate part, even though the two parcels are sold as a part of the same transaction, absent some strong reason for treating the sales as one. In that case, we did go on to point out that there were reasons why the transaction was structured as two sales and not one. The two tracts had been acquired by the taxpayer at different times, and the taxpayer owned only a half interest in one of the properties and a total interest in the other. Also, there was unpaid mortgage on the property he owned outright, whereas the property in which he owned only a half interest was free of any mortgage at the time of sale. However, the premise of our opinion was that where a transaction is structured as two separate sales, two separate sales generally will be recognized for the purposes of section 453.

The *Collins* case was presented as a fully stipulated case. It involved an overall transaction in which the taxpayer sold 52.56 acres of land. The sales agreement stated that the land would be sold at a price of $5,000 an acre. However, under the agreement, 32.89 specified acres were to be sold for $164,450, to be paid $19,670 in cash and a mortgage note for the balance, secured by the 32.89 acres, both to be delivered at settlement. The other 19.67 acres were to be paid for in cash at settlement and were to be free and clear of the lien on the 32.89 acres. At the closing, a deed was delivered to the purchaser covering the 52.56 acres of land, and on the same day, in addition to the cash amounts called for under the agreement, a mortgage covering the 32.89 acres was delivered by the purchaser to the seller. Both the deed and the mortgage were recorded. The taxpayer, on his tax return for the year of sale, reported the sale of the 19.67 acres as being a separate sale entirely for cash. He reported the sale of the 32.89 acres on the installment basis, showing that this acreage was sold for $19,670 cash and a mortgage of $144,780. Respondent, in his notice of deficiency

determined that the transaction constituted one sale and, therefore, the cash paid exceeded the 30-percent limitation of section 453(b)(2). In holding that for the purposes of section 453(b)(2) there had been two sales, we stated that although the deed given to the purchaser covered the full 52.56 acres, the mortgage indenture specifically excepted the 19.67 acres which were left unencumbered. We then stated (48 T.C. at 49):

> On these facts we conclude that there was a transfer and payment for two separate properties. There appears to be no question that if this is what took place, the petitioner was correct in reporting the sale of the 32.89 acres as an installment sale. We see in this transaction no sham or fragmenting the sale for tax purposes. The land was acquired for subdivision and development which would make it desirable and necessary for the 19.67 acres as the first land to be used to be unencumbered. This is consonant with the provisions for successive payment and release of the additional acres as the development progressed. Such a view eliminates the need to consider whether another seller would be free to sell his tract of land in two separate lots at the same time and to the same buyer in circumstances different from what we have here. We might note in passing, however, that a seller with a buyer willing to pay all cash but persuaded by the seller to limit the cash to the comfortable and qualifying "28%," would probably have no difficulty qualifying under the installment sales provisions. [Fn. ref. omitted.]

From the two cases, it seems reasonable to draw the inference that where two separate documents have been used to sell contiguous parcels of real estate, even though the sale of one would not be made without the sale of the other, absent one of the sales being a sham, the sales are to be viewed as separate sales for the purpose of section 453(b). In such cases, we relied on the wording of the statute which referred to "a sale or other disposition of real property," stating that the term used is not the income from one transaction in real property but rather from a sale. Similarly, section 453(b)(1)(B) refers to the income from "a casual sale or other casual disposition of personal property." It does not refer to income received from one overall transaction in personal property. Under the rationale of the *Pritchett* and *Collins* cases, it would follow in the instant case that even though the redemption of 122 of petitioner's shares by the corporation was interrelated with the subsequent sale of the balance of his shares to Mr. Campbell, there are two sales for the purposes of section 453(b). There were two separate buyers, and the transactions were effected by separate documents. Here, also, there were

business reasons for structuring the transaction as two sales rather than one sale. Petitioner desired for personal reasons to receive a large amount of cash from the sale of his interest in the corporation. The corporation already possessed a sizable amount of cash. Mr. Campbell could not have paid in cash more than approximately $148,000 or $149,000. Although, as we have stated, it is reasonable to conclude that petitioner arranged the transaction to qualify the sale of the 259 shares to Mr. Campbell under the installment sales provision, this fact does not cause the conclusion we reached in the *Collins* and *Pritchett* cases to be inapplicable here. In the *Collins* case, the transaction was arranged to have the sale of the 32.89-acre parcel qualify for installment sales treatment. In the *Pritchett* case (63 T.C. at 172–173), we stated:

We would assume from the fact that petitioner had sold other properties on the installment basis that he was cognizant of the requirements for installment reporting under section 453, and had he wanted to be more certain that this transaction would be considered the sale of one property, he would have tried to arrange it differently. However, we also recognize that even treated as separate sales of separate properties both would have qualified for installment reporting were it not for the fact that the excess of the mortgage assumed over petitioner's basis in the Pritchett property must be included in the amount received in the year of sale, a fact which petitioner overlooked in reporting this transaction on his 1969 return.

In neither case does it appear that the fact that the taxpayer was attempting to arrange the sale as an installment sale was considered to be of importance.

In other situations in which respondent has questioned the use by a taxpayer of the installment sales method, this Court and other courts have held that a taxpayer may have the advantages of the installment sales provisions if he actually carries through an installment sale, even though the method he used was at his insistence for the purpose of minimizing his taxes. While in utilizing the installment method the taxpayer is undoubtedly seeking to lessen his tax burden, such tax avoidance is statutorily sanctioned. For instance, in *Rushing v. Commissioner*, 441 F.2d 593 (5th Cir. 1971), affg. 52 T.C. 888 (1969), the court pointed out that the taxpayer had made no attempt to change the character of the gain involved and convert what would be ordinary income into capital gain. Whether the sale met the installment sales requirements or not, the gain was capital gain. The court further pointed out

that there had been no attempt to shift the gain to a different taxable entity to reap the advantages of a lower tax rate. The only difference was whether the tax was paid on the capital gain all in 1 year or over the period of years during which the installment payments were received. The court proceeded to point out that a taxpayer was totally justified in arranging a sale to minimize his taxes by arranging it to meet the requirements of an installment sale. The problem involved in the *Rushing* case was different from that in the instant case. However, the language of the court in sustaining the use of the installment sales basis is equally applicable here. Petitioner in this case in 1976 reported in income the full amount of gain realized in redemption of his stock as a capital gain; he reported the payment received in the year 1976 on the sale to Mr. Campbell, treating a portion of such payment as capital gain and the balance as a recovery of basis, in accordance with the provisions of section 453. Here, as in the *Rushing* case, petitioner has not attempted to shift any of the gain on the sale of his stock to another entity but will report eventually all the gain realized as a result of the appreciation in the value of the stock. As stated in the *Rushing* case (at 597):

The only question is whether they must pay taxes on the entire amount of the gain in the year the corporations were liquidated or whether they may pay taxes on the entire amount over a period of years as the installment payments are received from the trusts. * * *

In this case, the same situation is present.

Considering the record in this case as a whole, we conclude that although the *Pritchett* and *Collins* cases both involved real estate sales, the factual situation in the instant case is more comparable to the facts in those cases than to the facts in the *Farha* case. In this case, there were two different sales transactions of the stock with sales documents. Although the two transactions were part of an overall plan for the purposes of section 302(b), so that the redemption qualifies as an exchange under section 302(a), the fact of such an overall plan does not require the conclusion that the two sales should be considered as one for the purpose of section 453(b). The rationale of the *Pritchett* and *Collins* cases is clearly to the contrary.

Finally, we consider it helpful to explain what may be perceived to be a logical inconsistency in our holdings; namely,

that while we have held the redemption and sale of stock to be an integrated transaction for purposes of determining whether such redemption was either not essentially equivalent to a dividend under section 302(b)(1) or a complete termination of petitioner's proprietary interest in the corporation under section 302(b)(3), we have also held the two are to be treated as separate sales for purposes of petitioner's qualifying for the installment sales method on his subsequent sale of his 259 shares to a third party. In so holding, we are not unmindful of the general principle that the substance of a transaction governs its taxation.

A distribution which is purportedly a redemption but which is in actuality a payment of the pre-existing binding obligation of a taxpayer-shareholder to purchase the stock of another shareholder of the corporation, is treated as a dividend to the shareholder whose purchase obligation is so discharged. The fact that the corporation acquires the shares redeemed is immaterial. *Wall v. United States*, 164 F.2d 462 (4th Cir. 1947). On the other hand, in a transaction structured similarly to that engaged in by petitioner, i.e., an integrated redemption-sale transaction, there is no dividend to the remaining shareholder so long as he personally was not unconditionally obligated to purchase the shares redeemed from the selling shareholder. *Edenfield v. Commissioner*, 19 T.C. 13 (1952). This conclusion is now so well established that taxpayers undoubtedly have structured transactions based on this Court's decision in *Edenfield* and the Internal Revenue Service's acquiescence in that and similar decisions[7] that the redemption by the corporation is not a dividend distribution to the remaining shareholder, so long as he did not have a primary, unconditional personal obligation to buy. Although the economic consequences in either the *Wall*-type situation or the *Edenfield*-type situation are virtually the same, two entirely different tax results in effect have been judicially and administratively mandated.[8] Thus, as two commentators have observed, in this area "the form of the transaction—as in many areas of the tax law—continues to control." See B. Bittker & J.

---

[7]See Rev.Rul. 69–608, 1969–2 C.B. 42.

[8]See *Jacobs v. Commissioner*, T.C. Memo. 1981–81.

Eustice, Federal Income Taxation of Corporations and Share-holders par. 9.25, at 9–40 (4th ed. 1979). Therefore, in our view, it is entirely consistent with our holding in the *Edenfield* case to hold that in the instant case two sales have occurred for purposes of determining whether petitioner qualifies for the installment sale method on the sale of his 259 shares to a third party.

To accept respondent's contention that there is a single sale for purposes of deciding whether petitioner is entitled to report the sale of his 259 shares to a third party under the installment method, is to hold that, in substance, the proceeds received in the redemption were but a part of the purchase price paid for petitioner's stock by the third party. Plainly, such a holding should not be made on the facts present. The redemption was not a sham, and the corporation cannot be viewed as a mere conduit through which a third party made payment for stock purchased. See *TSN Liquidating Corp. v. United States*, 624 F.2d 1328 (5th Cir. 1980); *Midwest Savings Association v. Commissioner*, 75 T.C. 262, 267–269 (1980); *Gilmore v. Commissioner*, 25 T.C. 1321, 1323–1324 (1956); *Coffey v. Commissioner*, 14 T.C. 1410, 1417–1418 (1950). Cf. *Waterman Steamship Corp. v. Commissioner*, 430 F.2d 1185 (5th Cir. 1970), revg. 50 T.C. 650 (1968).

Having held that petitioners are entitled to report the gain on the sale of the 259 shares of stock to Mr. Campbell on the installment basis, we do not reach the question of whether the fair market value of the note received in part payment for those shares of stock is the same as its face value.

We have decided the only issues presented for petitioners. However, since it appears that one adjustment raised in the notice of deficiency was not placed in issue in this case,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

NIMS, *J.*, concurring: Sections 302(b)(1) and 302(b)(3) focus our attention on *whether* there has been a complete termina-tion of interest, whereas section 453(b) focuses on *how* the termination was accomplished. I think it is essential to bear

this distinction in mind to rebut any imputation that we are shifting our ground in the middle of the case. A simple illustration illuminates the point: If A sells 50 percent of his X Corporation stock to B for cash, and the remaining 50 percent to C for an installment note, A has terminated his interest in X Corporation, but no one would seriously argue that the sale to B tainted the sale to C. I can visualize no policy reason why, absent the peculiarities of a case like *Farha v. Commissioner*, 58 T.C. 526 (1972), affd. 483 F.2d 18 (10th Cir. 1973), X Corporation's redemption of 50 percent of the stock for cash and C's purchase of 50 percent for an installment note should be treated any differently. This I perceive to be the essential rationale of our decision.

KÖRNER and HAMBLEN, *JJ.*, agree with this concurring opinion.